FILED
2007 Jul-23  PM 09:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **ELAINE L. CHAO,** | ) |
| **Secretary of Labor,** | ) |
| **United States Department of Labor,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **Case No.: 2:02-cv-01174-VEH** |
|  | ) |
| **TYSON FOODS, INC., )** | **OPPOSED** |
|  | ) |
| **Defendant.** | ) |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF HER MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I. Statement of Undisputed Relevant Material Facts.................................................1

    A.    Jurisdiction and Coverage ...................................................................1

    B.    Tyson's Blountsville Plant ...................................................................1

    C.    Sanitary and Protective Clothing at Blountsville ...............................4

    D.    "Donning and Doffing" Sanitary and Protective Items and Hand
           Washing and Sanitizing ......................................................................7

    E.    Tyson's Timekeeping Practices .........................................................10

    F.    Tyson's Pay Practices .......................................................................11

    G.    Breaks ...............................................................................................15

    H.    The U.S. Department of Labor's Enforcement Policies ...................22

II. Discussion of Relevant Legal Authorities...........................................................25

    A.    Standard for Summary Judgment.......................................................25

    B.    Donning and Doffing by Employees of Required Sanitary
           and Protective Clothing and Equipment Constitutes "Work"
           Under the FLSA..................................................................................26

    C.    The Donning and Doffing Activities Are Integral and Indispensable
           to the Employees' Principal Activities................................................32

    D.    Tyson Cannot Rely on a "De Minimis" Defense to Avoid Paying
           its Employees for Time Regularly Spent Donning and Doffing.........42

    E.    Tyson Improperly Deducted a Second 30 Minute Break
           Period from the Wages of Eight-Hour Shift Employees....................46

i

F.     Tyson Is Not Entitled to the Good Faith Defense Provided by
       Section 259 of the Portal Act...........................................................54

G.     Tyson Is Not Entitled to the Good Faith Defense with Respect to the
       Payment of Liquidated Damages.......................................................62

Conclusion.....................................................................................................64

# TABLE OF AUTHORITIES

Page

Cases:

*Aeromotive Metal Products, Inc. v. Wirtz*, 312 F.2d 728 (9th Cir. 1963)..............48

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997)....................................26

*Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003),
   *aff'd*, 546 U.S. 21 (2005)...............................................................................*passim*

*Armour & Co. v. Wantock*, 323 U.S. 126 (1944)....................................................27

*Anderson v. Arvey Corp.*, 84 F. Supp. 55 (E.D. Mi. 1949)....................................60

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242  (1986)..........................................26

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)................................28

*Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901 (9th Cir. 2004).............29, 38, 40

*Barnhart v. Walton*, 535 U.S. 212 (2002)................................................................27

*Barrentine v. Arkansas-Best Freight System, Inc.*,
   750 F.2d 47 (8th Cir. 1984)..........................................................................29, 31

*Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802 (11th Cir. 1992).............26, 46, 47

*Bobo v. United States*, 37 Fed. Cl. 690 (Fed. Cl. 1997)........................................35

*Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340 (11th Cir. 2007).......27, 25

*Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. Nov. 3, 1981)...........26

*Brock v. City of Cincinnati*, 236 F.3d 793 (6th Cir. 2001) ....................................43

*Brock v. Claridge Hotel & Casino*, 664 F. Supp. 899 (D.N.J. 1986)
  *remanded on other grounds,* 846 F.2d 180 (3d Cir. 1988),
  *cert. denied,* 488 U.S. 925 (1988).....................................................................51, 53

*Brock v. Mercy Hosp. & Med. Ctr.*, No. 84-1309,
  1986 WL 12877 (S.D. Cal. 1986)..................................................................39, 42

*Brown v. Dunbar & Sullivan Dredging Co.*, 189 F.2d 871 (2d Cir. 1951).............60

*Burton v. Hillsborough County, Fla.*, 181 Fed. Appx. 829 (11th Cir.), *cert.*
  *denied,* 127 S. Ct. 556 (2006)........................................................................27, 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..........................................................26

*Central Missouri Tel. Co. v. Conwell*, 170 F.2d 641 (8th Cir. 1948).....................60

*Central Oil & Supply Corp. v. United States*, 557 F.2d 511 (5th Cir. 1977).........26

*Chavez v. IBP, Inc. and Tyson Foods, Inc.,* No. CV-01-5093-RHW
  (E.D. Wash. May 16, 2005)................................................................49, 50, 52, 59

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)......27

*Cole v. Farm Fresh Poultry, Inc.,*  824 F.2d 923 (11th Cir. 1987)................*passim*

*Dade County, Fla. v. Alvarez*, 124 F.3d 1380 (11th Cir. 1997).................26, 47, 54

*Davis v. Charoen Pokphand (USA), Inc.,*
  302 F. Supp. 2d 1314 (M.D. Ala. 2004).......................................................28, 52

*Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689 (4th Cir. 1990)..........60

*Dunlop v. City Elec., Inc.*, 527 F.2d 394 (5th Cir. 1976)...............................*passim*

*Dybach v. State of Florida Department of Corrections,*
  942 F.2d 1562 (11th Cir. 1991).............................................................................63

*Equal Employment Opportunity Comm'n v. Baltimore and Ohio R.R. Co.*
  632 F.2d 1107 (4th Cir. 1980), *cert. denied,* 454 U.S. 825 (1981).....................57
*Equal Employment Opportunity Comm'n v. Home Ins. Co.,*

672 F.2d 252 (2d Cir. 1982)..................................................................54

*Fast v. Applebee's Int'l, Inc.*, 2007 WL 1309680 (W.D. Mo. May 3, 2007)..........45

*Federal Trade Comm'n v. Bunte Bros.*, 312 U.S. 349 (1941)................................54

*Fox v. Tyson Foods, Inc.*, No. 99-BE-1612,
2002 WL 32987224 (N.D. Ala. 2002) ................................................45

*Garcia v. Tyson Foods, Inc.*,
474 F. Supp. 2d 1240 (D. Kan. Feb. 16, 2007)....................................28

*Glenn v. General Motors Corp.*, 658 F. Supp. 918 (N.D. Ala. 1986), *aff'd
in part, rev'd in part*, 841 F.2d 1567 (11th Cir. 1988), *cert. denied*,
488 U.S. 948 (1988)........................................................................62

*Goldberg v. Willmark Serv. Sys., Inc.*, 215 F. Supp. 577 (D. Minn. 1961),
*aff'd*, 317 F.2d 486 (8th Cir.), *cert. denied*, 375 U.S. 897 (1963)........................48

*Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912 (N.D. Ill. 2003)..........32

*Gorman v. Consolidated Edison Corp.*, 488 F.3d 586 (2d Cir. 2007)....................36

*Hartsell v. Dr. Pepper Bottling Co.*, 207 F.3d 269 (5th Cir. 2000.........................47

*IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005)...........................................................*passim*

*Joiner v. City of Macon*, 814 F.2d 1537 (11th Cir. 1987)......................................62

*Jordan v. IBP, Inc. and Tyson Foods, Inc.*, Case No. 3:02-1132 (M.D. TN
October 12, 2004)..........................................................................59

*Kohlheim v. Glynn County, Georgia*, 915 F.2d 1473 (11th Cir. 1990).................46

*Kosakow v. New Rochelle Radiology Associates, P.C.*,
274 F.3d 706 (2d Cir. 2001).............................................................38

*Lindow v. United States*, 738 F.2d 1057 (9th Cir. 1984).................................43, 45

*Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339 (2007).........................35

*Lopez v. Tyson Foods*, No. 06-459,
2007 WL 1291101 (D. Neb. March 20, 2007)......................................./..............28

*Mayhew Inc., v. Wirtz,* 413 F.2d 658 (4th Cir. 1969)..............................................58

*Mireles v. Frio Foods, Inc.,* 899 F.2d 1407 (5th Cir. 1990)................47, 48, 49, 50

*Mitchell v. Greinetz*, 235 F.2d 621 (10th Cir. 1956)...............................................51

*Mitchell v. King Packing Co.*, 350 U.S. 260 (1956).................................................38

*Mitchell v. Turner*, 286 F.2d 104 (5th Cir. 1960)....................................................51

*Nelson v. Alabama Institute For Deaf and Blind*,
896 F. Supp. 1108 (N.D. Ala. 1995)...........................................................................58

*Olson v. Superior Pontiac-GMC, Inc.,* 765 F.2d 1570 (11th Cir.), *modified on
other grounds,* 776 F.2d 265 (1985).........................................................................57

*Pilkenton v. Appalachian Regional Hosp., Inc.,*
336 F. Supp. 334 (W.D. Va. 1971)...............................................................57, 61

*Reich v. IBP, Inc.*, 38 F.3d 1123 (10th Cir. 1994)............................................25, 28

*Reich v. IBP, Inc.* No. 88-2171, 1996 WL 137817 (D. Kan. 1996).................44, 45

*Reich v. Monfort, Inc.*, 1995 WL 817796 (D. Colo. 1995), *aff'd in part, rev'd in
part*, 144 F.3d 1329 (10th Cir. 1998) ................................................................45, 56

*Roy v. County of Lexington, South Carolina*, 141 F.3d 533 (4th Cir. 1998) .........61

*Saunders v. John Morrell & Co.,* No. C88-4143,
1992 WL 531674 (N.D. Iowa 1992)..................................................................44

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).......................................................27

*Soler v. G & U Inc.*, 615 F. Supp. 736 (S.D. N.Y. 1985)........................................61

*Steiner v. Mitchell*, 350 U.S. 247 (1956) .........................................................*passim*

*Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590 (1944)............46

*Townley v. Floyd & Beasley Transfer Co.*, 1989 WL 205341 (N.D. Ala. 1989)....62

*Tum v. Barber Foods, Inc.*, 360 F.3d 274 (1st Cir. 2004), *aff'd, in part, on other grounds*, 546 U.S. 21 (2005) ......................................................31, 37

*Union Stock Yard & Transit Co. v. United States*, 308 U.S. 213 (1939) ..............60

*United States v. American Union Transports*, 327 U.S. 437 (1946) ........................54

*United States v. Stocks Lincoln-Mercury, Inc.*, 307 F.2d 266 (10th Cir. 1962).. ...61

Federal Statutes:

Fair Labor Standards Act of 1938, as amended,
29 U.S.C. 201 *et seq.* ...................................................................................26

  29 U.S.C. 203(g) ......................................................................26
  29 U.S.C. 203(o) ......................................................................36
  29 U.S.C. 207(a)(1) ..................................................................26
  29 U.S.C. 208 (note)..................................................................33
  29 U.S.C. 216(b) ......................................................................61
  29 U.S.C. 216(c) ........................................................................1

Fair Labor Standards Amendments of 1949, ch. 736, §16(c),
63 Stat. 920 (1949).......................................................................33

Portal-to-Portal Act of 1947,
29 U.S.C. 251 *et seq.* ...................................................................32

  29 U.S.C. 254 ..................................................................32, 33
  29 U.S.C. 254(a) ......................................................................33
  29 U.S.C. 254(a)(1) ..................................................................33
  29 U.S.C. 254(a)(2) ..................................................................33
  29 U.S.C. 259(a) ......................................................................54
  29 U.S.C. 259(b)(1) ..................................................................60
  29 U.S.C. 260 ..........................................................................62

Federal Regulations:

9 C.F.R. 416.5 ................................................................................................29, 31

29 C.F.R. Part 785 ........................................................................................27, 33
29 C.F.R. 785.7 .......................................................................................27, 28, 32
29 C.F.R. 785.14 ................................................................................................57
29 C.F.R. 785.16 ..........................................................................................56, 57
29 C.F.R. 785.16(a) ......................................................................................46, 53
29 C.F.R. 785.19(a) ...........................................................................................47
29 C.F.R. 785.24 ................................................................................................56
29 C.F.R. 785.25................................................................................................56
29 C.F.R. 785.26 ..........................................................................................36, 56
29 C.F.R. 785.47 ....................................................................................42, 43, 56

29 C.F.R. Part 790 .............................................................................................33
29 C.F.R. 790.2(a) .............................................................................................34
29 C.F.R. 790.6(a) .............................................................................................33
29 C.F.R. 790.6(b) .............................................................................................33
29 C.F.R. 790.7(g)..............................................................................................55
29 C.F.R. 790.8 .................................................................................................36
29 C.F.R. 790.8(a) .............................................................................................34
29 C.F.R. 790.8(b) ........................................................................................33, 34
29 C.F.R. 790.8(c) .......................................................................................*passim*
29 C.F.R. 790.13(a) ......................................................................................54, 60
29 C.F.R. 790.15(a) ...........................................................................................57
29 C.F.R. 790.15(b) ...........................................................................................58
29 C.F.R. 790.15(d)............................................................................................58
29 C.F.R. 790.17(h) ...........................................................................................61
29 C.F.R. 790.18(h) ...........................................................................................54
29 C.F.R. 790.18(i) ............................................................................................61
29 C.F.R. 790.19(c) ...........................................................................................60

29 C.F.R. 1910.132 ......................................................................................29, 31

Miscellaneous:

12 Fed. Reg. 7655 (Nov. 18, 1947) ...................................................................33

93 Cong. Rec. 2297 (1947) ................................................................33
93 Cong. Rec. 2300 (1947) ................................................................34
93 Cong. Rec. 4390 (1947) ................................................................58

Federal Rule of Civil Procedure 56(c) ................................................25

*Hearings before a Subcomm. of the Senate Comm. On Labor and Public
Welfare*, 81st Cong., 1st Sess., on S. 58, S. 67, S. 92, S. 105, S. 190,
   S. 248, and S. 653, p. 815, at 815-17, and p. 1173, at 1175-79 (1949)................37

Wage and Hour Advisory Memorandum No. 2006 (May 31, 2006)...............*passim*

Wage and Hour Opinion Letter, 1994 WL 1004880 (Nov. 7, 1994) ..............53, 54

Wage and Hour Opinion Letter, (June 21, 1993)....................................56

Wage and Hour Opinion Letter, 1993 WL 901156 (Mar. 19, 1993) .....................42

Wage and Hour Opinion Letter, 1982 WL 213488 (Aug. 30, 1982) ....................53

Wage and Hour Opinion Letter, (July 12, 1973)....................................56

Wage and Hour Opinion Letter, (March 14, 1967)...................................56

Wage and Hour Opinion Letter, (October 13, 1964).................................53

Wage and Hour Opinion Letter, (January 25, 1962).................................56

Wage and Hour Opinion Letter, (February 28, 1961)................................56

Wage and Hour Opinion Letter, (May 8, 1950)......................................56

Wage and Hour Opinion Letter, (March 19, 1949)...................................56

ix

# I.  Statement of Undisputed Relevant Material Facts

## A.    Jurisdiction and Coverage

1.      Defendant, Tyson Foods, Inc. ("Tyson"), is a Delaware corporation that, since at least May 9, 2000, has operated a chicken-processing plant located in Blountsville, Blount County, Alabama ("Blountsville plant").  (Exhibit Z at ¶ III; Exhibit AA at ¶ 3.)

2.      Since May 9, 2000,[1] Tyson has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Sections 3(r) and/or 3(s)(1) of the FLSA, and its employees and the enterprise were subject to Section 7 of the FLSA.  (Exhibit Z at ¶ V; Exhibit AA at ¶ 5.)

3.      Jurisdiction of this action is conferred by 29 U.S.C. §§ 1331 and 1345, and 29 U.S.C. §§ 216(c) and 217.  (Exhibit Z at ¶ II; Exhibit AA at ¶ 2.)

## B.    Tyson's Blountsville Plant

4.      The Blountsville plant receives live birds from farms, and processes them to produce products for its customers.  (Exhibit A at 11: 11-13.)

5.      The plant runs two production shifts and one sanitation shift in each main production area: (a) First Processing, where live birds are received, hung, slaughtered, eviscerated, halved, and chilled; (b) until November 2002, Debone, where chickens were deboned and wings were processed; and (c) Further

---

[1] The Secretary filed her Complaint on May 9, 2002.  The applicable statute of limitations under the Fair Labor Standards Act is two years.  *See* 29 U.S.C. 216(c).

Processing, where chicken breasts and strips/tenders are processed and packaged. In March 2003, the plant opened a WOG Marination department, where whole birds are processed and packaged, and which replaces the Debone department. (Exhibit M, Answer No. 4; Exhibit P, Answer No. 17; Exhibit B at 58:16 to 59:8.)

6.      All three production areas are active on first shift. Debone (until discontinued in November 2002) and Further Processing also operate on second shift. First Processing operated on third shift until November 2005, when its operations were moved to second shift. WOG Marination (which began operations in March 2003) operates on first and second shift. The off-production shift is a cleaning shift. (Exhibit M, Answer No. 4; Exhibit P, Answer No. 17; Exhibit P, Answer No. 4.)

7.      The time for the production shifts differs for different lines. Most shifts are approximately 9 hours in length. (*See* Exhibit D; Exhibit B at 164:23 to 170:21 (explanation of Perstime clocking reports–mastercard time); Exhibit N at 91:23 to 92:21, 94:17 to 102:11, 103:09 to 104:23 (explanation of Perstime clocking reports for line employees).)

8.      First Processing shifts (as of November 2003): For most employees[2], the 1st shift began between 6:50 a.m. and 6:57 a.m. A few departments began at 8:00 a.m. The 3rd shift for most employees began between 9:20 p.m. and 9:27

---

[2] References to employees are to hourly production employees at the Blountsville plant.

p.m.  A few departments began at 9:45 p.m. or at 10:30 p.m. (*See* Exhibit D at 1-3, 4-6.)

9.     WOG Marination shifts (as of November 2003):  First shift began at 6:57 a.m., and second shift began at 4:00 p.m.  (*See* Exhibit D at 7, 8.)

10.     Further Processing (as of November 2003):  The first shift for the majority of employees began at 6:25 a.m.  For the remaining employees -- who worked in Packout -- first shift began at 7:00 a.m.  The second shift for the majority of employees began at 3:25 p.m.; for Packout employees, it began at 3:50 p.m.  (*See* Exhibit D at 9-10, 11-12.)

11.     To prevent food-borne disease, Tyson strives to keep all meat temperature in the Debone, WOG Marination, and Further Processing departments as close to 40 degrees or less as possible.  (Exhibit E at 122:11 to 125:17; Exhibit F at 1.)

12.     The areas of the plant where Debone was located and where WOG Marination and Further Processing are located are maintained at 55 degrees or below to help keep the chicken at or below permitted temperature limits.  (Exhibit E at 127:3 to 128:14.)

C.   **Sanitary and Protective Clothing at Blountsville**

13.   Tyson requires employees to wear certain items of sanitary and protective clothing and equipment.  (Exhibit M, Answer Nos. 5 and 6; Exhibit T, Answer No. 18; Exhibit P, Answer No. 18.)

14.   Among the items employees wear are:  cotton smock, beard net, hairnet, hearing protection, plastic apron, plastic sleeves, cotton gloves, safety glasses, rubber gloves, safety vest, rain suit, cut-resistant glove (also known as a "hand guard"), hard plastic arm guard, freezer suit, bump hat, and paper smock. (Exhibit M, Answer No. 5; Exhibit P, Answer No. 6.)

15.   Employees wear different combinations items.  Which items an employee wears depends on Tyson's requirements for the job and which additional items the employee needs to perform his or her job.  (Exhibit M, Answer Nos. 5 and 6; Exhibit T, Answer No. 18; Exhibit P, Answer No. 18; Exhibit A at 162:7-23; Exhibit E at 144:1 to 145:7, 193:4-24; Exhibit BB [Ruth Childers] at ¶¶ 13-14.)

16.   To comply with USDA and OSHA regulations, Tyson requires employees to wear a smock, hairnet, beard net for men with facial hair, and hearing protection.  (Exhibit G at 42:1 to 46:4, 55:2-14, 76:2-16; Exhibit A at 150:21 to 152:24.)

17.     In addition to government-imposed requirements, Tyson requires --
pursuant to its corporate and plant "personal hygiene policies" -- the following
employees to wear the following items:  all employees (except live hangers)[3] must
wear a smock and a hairnet; all men with facial hair must wear a beard net; all
employees whose street clothes extend beyond the length of their smocks' arms
must wear plastic sleeves; all employees wearing fingernail polish or artificial
fingernails or having cuts or scratches on their hands must wear latex or rubber
gloves; and employees who wear cotton gloves must wear rubber gloves over
them.  (Exhibit M, Answer Nos. 5 and 6; Exhibit T, Answer No. 18; Exhibit P,
Answer No. 18; Exhibit H, Response No. 54; Exhibit A at 138:23 to 139:25, 149:1
to 150:25; Exhibit E at 118:6-21, 144:1-16; Exhibit BB [Betty Stanley] at ¶¶ 3-4,
7-8, [Joseph Childers] at ¶¶ 4-9; Exhibit MM at bullet points 4, 5, 6, 10; Exhibit I
at ¶¶ 4.1, 4.2, 4.5, 4.7.)

18.     Tyson's personal hygiene policies are designed to ensure that
products are produced in a sanitary environment and are not contaminated by
bacteria or foreign objects, such as band-aids or human hair.  (Exhibit F; Exhibit I;
Exhibit I at 1).

19.     Pursuant to Tyson's safety policy, all employees must wear hearing
protection; all employees who use a knife or scissors must wear a cut-resistant

---

[3] Tyson requires live hangers to wear hearing protection and safety glasses.  Exhibit P, Answer
No. 18; Exhibit BB [Joseph Childers] at ¶¶ 4, 6.

glove and hard plastic arm guard; and all employees exposed to eye hazards -- such as splashing fluid or scratching from chickens -- must wear safety glasses. (Exhibit B at 45:2-16, 49:11-13; 218:25 to 219:9, 278:18 to 280:13 & deposition exhibit 18; Exhibit E at 141:6-11, 143:18-20; Exhibit BB [Joseph Childers] at ¶ 6; Exhibit I at bullet point 8.)

20.     Some employees in Debone and Further Processing are required to wear rubber gloves.  (Exhibit P, Answer No. 18; Exhibit BB [Virginia Butts] at ¶¶ 3, 4, 5, [Ruth Childers] at ¶¶ 5, 6, [Jeanette Hanna] at ¶¶ 3-4, [Cathy Self] at ¶¶ 3-4, [Betty Stanley] at ¶¶ 3-4.)

21.     Employees who touch chicken product have been told by supervisors that they are required to wear rubber gloves.  (Exhibit E at 191:6 to 192:22; Exhibit BB [Joseph Childers] at ¶ 9.)

22.     Employees wear aprons over their smocks so they can more efficiently perform their jobs in an environment, which may be cold or wet or entail exposure to raw chicken, chicken guts or blood, or involve the handling of frozen or cold or messy product.  (Exhibit E at 117:16-19 (aprons in First Processing); Exhibit A at 168:7-21 (different color smocks to prevent cross contamination by an employee who has feathers or guts or blood on his clothing); Exhibit BB [Betty Stanley] at ¶ 6; [Cathy Self] at ¶ 6.)

23.     Employees wear aprons to reduce the frequency of having to obtain a clean and dry smock during their unpaid breaks.  (Exhibit E at 117:10-19; Exhibit N at 125:12 to 126:1; Exhibit BB [Cathy Self] at ¶ 6.)

24.     Employees wear long sleeved clothing (covered with plastic sleeves if it extends beyond the length of their smocks' arms, *see* Fact 17, *supra*), rubber gloves, cotton gloves, and/or aprons to help keep warm in Debone, WOG Marination, and Further Processing departments, which Tyson seeks to maintain at 55 degrees.  Employees state that it can be much colder than 55 degrees in these locations.  (Exhibit E at 127:3 to 128:14, 142:4-19; Exhibit BB [Jeanette Hanna] at ¶¶ 4-5, [Betty Stanley] at ¶ 5, [Virginia Butts] at ¶¶ 3-6.)

25.     Tyson does not have a written listing of which sanitary and protective items employees in each job are required to wear; instead, an employee learns what is required through the employee's supervisor.  (Exhibit B at 214:14 to 215:16; Exhibit BB [Virginia Butts] at ¶ 5, [Betty Stanley] at ¶ 4.)

**D.     "Donning and Doffing" Sanitary and Protective Items and Hand Washing and Sanitizing**

26.     Pursuant to Tyson's "personal hygiene policies," employees must put on their sanitary and protective clothing and equipment after entering the plant as they are not permitted to wear their smocks, hairnets (since 2003), beard nets, aprons, plastic sleeves, gloves, or any of their other sanitary and protective gear (except earplugs and rubber boots) outside of the plant.  (Exhibit E at 151:7 to

7

154:21; Exhibit B at 259:19 to 260:4; Exhibit BB [Ruth Childers] at ¶ 12; Exhibit

I at ¶ 4.3: Maintenance of Clothing; Exhibit P, Answer No. 18; Exhibit H,

Response No. 55.)

27.     Employees are required to put on ("don") their smock, hairnet, beard

net (if required), and hearing protection before entering the plant processing area.

(Exhibit N at 41: 19 to 44: 14; Exhibit BB [Ruth Childers] at ¶ 13, [Jeanette

Hanna] at ¶ 11, [Betty Stanley] at ¶ 11.)

28.     Employees who have a position on the processing line must put on

whatever additional items that they will wear – such as an apron, cotton gloves,

rubber gloves, plastic sleeves, hard plastic arm guard, cut-resistant glove, and

safety goggles -- before they begin processing-line duties.  (Exhibit BB [Ruth

Childers] at ¶ 14, [Jeanette Hanna] at ¶ 12, [Betty Stanley] at ¶ 12.)

29.     Employees must wash and sanitize their rubber gloves or hands (if no

gloves are worn), their aprons, and their plastic sleeves before commencing other

required activities on the processing floor.  (Exhibit H, Response No. 84; Exhibit

E at 232:2 to 233:13, 234:24 to 236:10, 238:15 to 239:18 & deposition exhibit

nos. 2 & 3; Exhibit A at 172:15 to 173:22; Exhibit I at ¶ 4.2.d; Exhibit BB

[Virginia Butts] at ¶ 7, [Ruth Childers] at ¶ 15, [Betty Stanley] at ¶ 13.)

30.     The hand washing procedure applies "before starting work, after each

absence from the work station, upon any reentry into the food processing area and

8

any other time when the hands may have become soiled or contaminated."

(Exhibit K.  *See* Exhibit BB [Jeanette Hanna] at ¶ 12, [Betty Stanley] at ¶ 14.)

This includes when employees return from breaks.   (Exhibit E at 232:2 to 233:13,

234:12 to 236:10, 237:14 to 239:18, 240:11 to 241:7 & deposition exhibit 2 at ¶¶

4.2d, 4.4; deposition exhibit 3 at 1("NOTE), 2; deposition exhibit 5.)

  31. The hand washing procedure provides seven required steps. (Exhibit

K.  *See* Exhibit BB [Jeanette Hanna] at ¶ 12, [Betty Stanley] at ¶14.)  Specifically,

employees must:

> Rinse hands/gloves with potable water to remove extraneous filth.  Place a
> quarter size drop of E-2 hand soap into the palm of hand/glove.  Rub hands
> together to work up a lather.
> A. Scrub between fingers by interlacing fingers and rubbing back and forth.
> B. Scrub under fingernails by rubbing the fingertips in the palm of opposite
> hand.
> C. Scrub back of hands.
> D. Scrub half way up the forearms (or to top of gloves).
> Rinse off soap, starting with the forearms (or top of gloves) with potable water.
> Dry hands/gloves with a paper towel.
> Dip hands/gloves in an E-2 sanitizer if available/required.  Return to work
> station.

(Exhibit E at 237:14-22, 238:15-24 & deposition exhibit 3 at 2.)

  32. In addition to helping produce a safe product for Tyson's customers,

hand washing by its employees who handle raw poultry helps prevent  contracting

bacterial illnesses.  (Exhibit B 245:12 to 246:2; Exhibit F at 2.)

  33. Violation of Tyson's "personal hygiene policies" on sanitary and

protective clothing or washing and sanitizing requirements should result in

disciplinary action.  (Exhibit I at ¶ 4.12 (Violation); Exhibit I; Exhibit L; Exhibit

BB [Virginia Butts] at ¶ 9, [Jeanette Hanna] at ¶ 16, [Betty Stanley] at ¶ 15.)

**E.     Tyson's Timekeeping Practices**

34.     Tyson uses a system called "Perstime" to track work hours of

employees.  (Exhibit M, Answer No. 4.)

35.     Perstime records the date and time (in military hours plus hundredths

of an hour) when an employee swipes his or her identification ("ID") badge into

one of Blountsville's time clocks.  (Exhibit M, Answer No. 1; Exhibit N at 83:25 to

84:5; Exhibit A at 84:15 to 85:19.)

36.     Employees are required to swipe their ID badges at the time clock not

later than the start of their scheduled paid time.  (Exhibit A at 76:15-25; Exhibit BB

[Ruth Childers] at ¶ 20; Exhibit O.)

37.     Employees are required to swipe their ID badges at the time clock

after leaving the processing floor at the end of the employees' shift.  (Exhibit BB

[Ruth Childers] at ¶ 22, [Jeanette Hanna] at ¶ 20; Exhibit O.)

**F.     Tyson's Pay Practices**

38.     Tyson requires its employees to perform the following activities after

arrival at the plant, prior to beginning other required activities at their work station

on the processing floor:  swipe a time clock; acquire clean sanitary and protective

clothing items from their locker and/or the supply window; put on sanitary and

protective clothing items; walk from locker or the supply window to the processing floor; walk through a sanitizing foot bath into the production area; wash their hands (or gloves) with soap and water and sanitize their hands (or gloves) and, if worn, aprons and sleeves; walk to their work station on the processing floor. (Exhibit B at 134:18 to 137:21 (employees can use any of the time clocks); Exhibit A at 198:13-23 (identifying the 9 plant time clocks available to workers); Exhibit BB [Virginia Butts] at ¶ 7; [Jeanette Hanna] at ¶ 10, [Betty Stanley] at ¶ 10; *see also* Exhibit BB [Joseph Childers] at ¶¶ 10-11 (describing activities for live hangers).)

39.     Tyson does not pay most of its employees based on when they swipe in at the time clocks. Instead, Tyson pays most of its employees based on a preset "mastercard" time. Generally, Tyson does not begin to pay its employees until the scheduled start of their shift. However, if an employee swipes in after his or her scheduled start time, the employee is paid at the time of his or her time clock swipe. (Exhibit A at 76:15-25, 207:2 to 208:6; Exhibit P, Answer No. 19.)

40.     A small number of specific positions may be paid based on their clock in times. Such positions include (in First Processing) truck spotter, hyster driver, picking room attendant; (in Debone) knife room attendant and setup; and (in Debone and WOG Marination) manifestor, stackoff, scaler, jack driver, and data collector. (Exhibit M, Answer No. 7; Exhibit P, Answer No. 19.)

41.     According to Tyson, employees in the Evisceration, Debone, and WOG Marination departments are (or, for Debone until its closing in 2002, were) required to be at their work station on the line by the time that product first reaches their work station.  Also, according to Tyson, employees in the Further Processing department are required to be at their work station five (5) minutes after the start of their paid time.  (Exhibit M, Answer No. 7; Exhibit P, Answer No. 19.)

42.     Tyson does not provide anything in writing telling employees what time to be at their work station; supervisors orally inform the employees.   (Exhibit A at 86:9 to 88:13; Exhibit B at 184:20 to 185:14; Exhibit N at 116:8 to 117:9.)

43.     Employees who clock in after the scheduled start of their paid time and employees who arrive at their work station after product first arrives may be subject to discipline.  If an employee has too many tardies, the employee is terminated.   (Exhibit A at 205:4 to 207:25; Exhibit B at 154:2 to 155:24; Exhibit Q at bullet point 6 (Counseling Statement:  "Failure to report to work station at scheduled times (including after break periods)"); Exhibit R at 2, section 3.D (points for showing up late); Exhibit S at 1, "Attendance Points (same).)

44.     Tyson does not record when employees begin to perform activities after swiping the time clock listed in Fact No. 38, *supra*, and Tyson does not record how long employees spend performing these activities.  (Exhibit A at 88:9-19, 89:14 to 90:4; Exhibit H, Response Nos. 23, 86, 88; Exhibit T, Answer No. 20 (objection).)

45.    Tyson does not prohibit employees from performing any of these activities prior to the start of their paid time.  (Exhibit A at 123:2 to 124:6.)

46.    Employees begin putting on sanitary and protective clothing before paid time starts.  (Exhibit BB [Ruth Childers] at ¶ 21, [Darlene Hardy] at ¶ 6; *see also* [Jeanette Hanna] at ¶¶ 18, 19 (most Debone employees on her shift donned items by 6:25 a.m.) together with Exhibit CC at ¶ 14 (Tyson electronic time records show Jeanette Hanna's paid time began at 6:25 a.m.).)

47.    In a November 2003 videotape of employees, nearly all hourly production employees observed by Dr. Radwin at the start of their shift began putting on their sanitary and protective clothing prior to the start of their paid time. (Exhibit DD at 9 (defining term "first principal activity") and 20-22 (Appendix 1: shows time at which employees begin performing a first principal activity and start of paid time.)

48.    Before leaving the plant at the end of their shift, Tyson requires employees to perform the following activities after completing their processing floor production duties:  wash and dry those sanitary and protective items that they will re-use on their next shift; take off all of their sanitary and protective items; throw away disposable items that will not be re-used; place their used smocks in a bin; stow in their locker any items that they will re-use on their next shift; and punch out on the time clock.  (Exhibit B at 213:4-13; Exhibit BB [Virginia Butts] at

¶ 10, [Jeanette Hanna] at ¶ 17, [Betty Stanley] at ¶¶ 16-17; *see also* Exhibit BB [Joseph Childers] at ¶ 13 (procedure for live hangers).)

49.     Paid time ends for most employees when the line supervisor swipes a "mastercard" on a time clock or when the employee clocks out, whichever is earlier. The swiping of the mastercard by the supervisor is supposed to occur when product reaches a certain point on the line or a specified worker has completed a specified task or departed the work area.  (Exhibit M, Answer No. 7; Exhibit P, Answer No. 19; Exhibit B at 197:10-16.)

50.     Tyson does not compensate employees for all time until the employee disposes of or stows in his or her locker the employee's last item of required sanitary or protective clothing at the end of his or her shift unless the employee completes such disposal or stowing prior to the earlier of the employee clocking out or the swiping of the mastercard by the supervisor.  (Exhibit M, Answer No. 7; Exhibit P, Answer No. 19; Exhibit B at 181:13 to 182:5, 198:3-19 (evisceration employees); Exhibit BB [Ruth Childers] at ¶ 22, [Jeanette Hanna] at ¶ 21, [Betty Stanley] at ¶ 18; *see also* Exhibit BB [Joseph Childers] at ¶ 14.)

51.     Tyson does not have records showing how long employees spend performing the activities listed in Fact 48, *supra*, at the end of their shift, nor does Tyson know how long it takes employees to perform these activities.  (Exhibit H, Response Nos. 28, 86, 88; Exhibit T, Answer No. 20 (objection).)

52.     On a November 2003 videotape of employees, almost half (24 out of 57) of the hourly production employees observed by Dr. Radwin at the end of their shift completed their disposal or stowing of their last item of sanitary and protective clothing after the end of their paid time.  (Exhibit DD at 4 (numbered point 3, defining term "last principal activity") and 23-24 (Appendix 2:  shows time at which employees completed last principal activity and end of paid time); Exhibit BB [Ruth Childers] at ¶ 22, [Jeanette Hanna] at ¶ 21, [Betty Stanley] at ¶ 18.)

53.     In May 2002, Perdue Farms entered into a consent judgment with the Department of Labor whereby it records and pays for all time its employees spend donning and doffing required equipment.  (Exhibit SS ¶¶ 6, 7.)

**G.     Breaks**

54.     Employees have two unpaid breaks during their work shift.  In Evisceration, RKP (Receiving/Killing/Picking) and WOG Marination, the breaks are 30 minutes long.  In Further Processing (and in Debone, while it was operating), the breaks are (were) 35 minutes long, 30 minutes of which is (was) uncompensated.   Plant management determines the length of the breaks.  (Exhibit U, Answer No. 12; Exhibit P, Answer No. 19; Exhibit B at 239:3-23.)

55.     Tyson does not designate the breaks as "meal periods."  Rather, they are 30-minute break periods.  (Exhibit B at 230:3-7.)

56.    Tyson does not want these employees to work more than 2-1/2 to 3 hours at one time for safety and ergonomic reasons, including prevention of repetitive motion injuries -- such as carpal tunnel syndrome -- and other injuries to the wrist and back.  (Exhibit B at 230:2-24, 236:4-6, 240:24 to 241:17; Exhibit E at 233:14-22, 264:10 to 265:12.)

57.    According to the "industry standard" or "best practice,"  breaks should occur every 2 ½ - 3 hours for ergonomic reasons.  (Exhibit B at 240:25 to 241:17).

58.    During the breaks in Evisceration, there is a full wash down of the equipment and the floors to rid the floor of blood, guts, or other undesirable buildup.  USDA regulations require such a wash down no less often than every 5-1/2 hours.  (Exhibit B at 234:25 to 236:3.)

59.    In processing locations other than Evisceration, where the temperature is below 55 degrees, there is a general wash down during breaks.  In Further Processing, the wash downs are assigned to Floor Persons and consist of washing the floors and getting the fat up off and removing excessive build-up from the floors.  In WOG Marination, the Floor Person sprays down the equipment and the floors.  (Exhibit B at 235:9 to 236:3; Exhibit E at 91:10-21, 186:1 to 188:3 & deposition exhibit 4 at 6.6.; Exhibit A at deposition exhibit 2, at [un-numbered] pages: 20 (Job Description of Floor Person, WOG Marination), 24, 28, 31, 34 (Floor Person, Further Processing lines.)

60.     Wash downs of equipment and surfaces that product may contact cannot occur while product is running on the line.  Floor rinsing is discouraged during production, but if it is necessary, it should be done with cold water on low pressure that does not create aerosol spray, mist, or condensation, which can cause cross-contamination.  (Exhibit B at 236:23 to 239:2, 262:2 to 263:15; Exhibit V at 2 (Food Borne Disease Prevention: Operational, item 3).)

61.     Only during break times, do sanitation employees clean the plant with water and chemicals, and wash surfaces and equipment, to ensure that the plant is clean, reduce bacteria, and prevent mold.  (Exhibit B at 54:7 to 57:25, 238:14 to 239:2.)

62.     According to plant manager Cagle, bacteria in the product would be bad for business.  (Exhibit B at 54:1-6).

63.     The first break for hourly production employees is scheduled  2-1/2 to 3 hours after the start of their shift, and the second break is scheduled 2-1/2 to 3 hours after the end of the first break.  (Exhibit B at 228:16 to 229:11; Exhibit D.)

64.     For example, for the workweek ending November 8, 2003, for most employees working on Further Processing Lines 1-4 on Second Shift, paid time began at 3:25 p.m.; unpaid breaks were scheduled to occur from 6:30 to 7:00 p.m. and from 9:30 to 10:00 p.m. each work day.  During that workweek in WOG Marination, the paid time for most employees on First Shift began at 4:00 p.m.;

17

unpaid breaks were scheduled to occur from 7:00 to 7:30 p.m. and from 10:00 to 10:30 p.m.  The paid time for most employees working on Third Shift in Evisceration began at 9:27 p.m.; unpaid breaks were scheduled to occur from 12:00 midnight to 12:30 a.m. and from 3:00 to 3:30 a.m.  (Exhibit D at 4, 8, 11.)

65.     Tyson's Safety Orientation Sheet provides that "[i]t is in your interest as well as ours that you remain safe and healthy and able to contribute to our continued success."  (Exhibit X.)

66.     During their unpaid breaks, employees who do not leave the plant use the restroom, eat, smoke, make telephone calls on a pay phone or plant telephone, watch television, talk with each other in the cafeteria or in one of the break rooms or outdoor break areas, or take care of personnel matters.  (Exhibit U, Answer Nos. 13, 15; Exhibit BB [Virginia Butts] at ¶ 12, [Darlene Hardy] at ¶ 7.)

67.     Tyson requires employees who leave the plant during a break to clock out before they leave and to clock back in upon return.  (Exhibit U, Answer No 14; Exhibit E at deposition exhibit 14; Exhibit B at 229:12-19; Exhibit A at 208:9-21.)

68.     Employees who are late returning to their work station after a break may be subject to discipline.  (Exhibit Q (Counseling Statement:  "Failure to report to work station at scheduled times (including after break periods)"); Exhibit BB [Virginia Butts] at ¶ 15; [Darlene Hardy] at ¶ 8.)

69.     Tyson's electronic time clock punch records for the period October 15, 2000 to July 3, 2006 indicate that at least 96.7% of employees do not leave the plant premises during either uncompensated break.  (Exhibit CC at ¶ 11 & Attachment 2.)

70.     The Blountsville Plant is in a rural part of Alabama, approximately 2 miles south of the town of Blountsville.  (Exhibit N at 44:20 to 45:5, 53:1 to 54:4; Exhibit U, at ¶¶ 3-5.)

71.     There are no sidewalks and little residential housing within walking distance of the plant.  (Exhibit EE at ¶ 6.)

72.     There is no public transportation to the plant.  (Exhibit EE at ¶ 7.)

73.     Most employees either drive their cars to the plant or car pool with other employees.  (Exhibit BB [Joseph Childers] at ¶ 15, [Darlene Hardy] at ¶ 9.)

74.     Many employees live more than 35 minutes from the plant by car. (Exhibit N at 54:15 to 55:3; Exhibit EE at ¶ 10 (75% of sampled employees live 15 minutes or more from the plant.)

75.     The only businesses located within 2 miles of the Blountsville Plant that are open after 6:00 p.m. are the Double B Barbeque, Jack's restaurant, a Subway restaurant, a convenience store and a Mexican tienda (grocery store).  Only the Subway restaurant (which closes at 10:00 p.m.) and the convenience store (which closes at 11:00 p.m.) are open after 9:00 p.m. (Exhibit EE at ¶ 8; Exhibit BB [Virginia Butts] at ¶ 14.)

76.     There was not enough time for production employees to leave the plant to do their errands during the break because they would only have 20 minutes that they could be away from the plant. (Exhibit BB [Virginia Butts] at ¶ 12 )

77.     At the breaks employees are required to take off their gloves, aprons, and sleeves (if they wear them) before they leave the production area.  (Exhibit A at deposition exhibit 2, ¶ 4.2d; Exhibit BB [Ruth Childers] at ¶¶ 12, 16-17.)

78.     Employees must remove smocks (and can drop them into a disposal bin), and hang aprons on a hook located near the production area exits before leaving the facility on an uncompensated break.  (Exhibit U, Answer No. 14.)

79.     If sanitary or protective clothing is soiled or torn employees typically replace it at the equipment window.  (Exhibit BB [Virginia Butts] at ¶ 10, [Jeanette Hanna] at ¶ 17, [Betty Stanley] at ¶ 16.)

80.     Employees wash their hands before leaving the production area because of bacterial concerns.  (Exhibit F; Exhibit E at deposition exhibit 5; Exhibit B at 245:10 to 246:2; Exhibit BB [Virginia Butts] at ¶ 11, [Betty Stanley] at ¶ 19.)

81.     Sometimes, employees wait in line at a wash station to wash their hands at the start of a break.  (Exhibit B at 246:3 to 247:4.)

82.     Employees do not have access to their cell phones in the plant.  They are limited to using pay phones and a house phone available to employees.  There

are no computers that may be accessed by employees.  (Exhibit BB [Darlene Hardy] at ¶¶ 7, 11; Exhibit U, Answer No. 15.)

83.     Employees are strongly encouraged to use the restroom during breaks to minimize the time away from the line during production.  (Exhibit BB [Darlene Hardy] at ¶ 12, [Virginia Butts] at ¶ 16, [Betty Stanley] at ¶ 20.)

84.     If employees leave the building they are required to clock out, and walk through the parking lot to their car.  This can take up to 10 minutes.  (Exhibit BB [Virginia Butts] at ¶ 13.)

85.     Gloves, aprons and sleeves are not permitted in restrooms.  (Exhibit E at 237:9-13; deposition exhibit 2 at ¶ 4.2d; deposition exhibit 3 at bullet point 9.)

86.     Contaminated outer garments must "be changed as often as necessary to maintain cleanliness."  (Exhibit F at exhibit 2 at section 4.2f.)

**H.     The U.S. Department of Labor's Enforcement Policies**

2000 Notice

87.     On January 27, 2000, Tyson representatives attended a DOL meeting in Baltimore, MD, where DOL representatives stated that employees begin work when they get a smock at the supply room door, and should be compensated beginning from the time they receive their sanitary and safety equipment.  (Exhibit Y at 3; Exhibit M, Answer No. 10 (pages 37-38); Exhibit FF at 1,4; Exhibit GG at 5.)

88.     In February 2000, Tyson representatives attended meetings in Atlanta, Georgia, and Little Rock, Arkansas, at which DOL representatives said that time spent donning and doffing protective and sanitary clothing and equipment required by law, the employer, or the nature of the work is compensable; if an investigator took a contrary position during the 1997 poultry initiative, it was "wrong." (Exhibit GG at 5-6; Exhibit M, Answer No. 10 (page 38).)

89.     On April 24, 2000, Wage and Hour representatives met with Tyson's Vice President Carl Johnson and others, and explained that insufficient consideration was given to recording and paying for obtaining, and donning and doffing clothing, as well as other work-related tasks, and that substantial changes are needed in Tyson's recordkeeping and pay practices.  This discussion was memorialized in a May 4, 2000 letter to Johnson.  (Exhibit HH at 2.)

90.     Johnson responded to the letter and did not challenge the characterization of the April 24, 2000 meeting as described in the May 4, 2000 letter.  (Exhibit HH at 1-2; Exhibit II.)

91.     On July 7, 2000, Wage and Hour sent a letter to Johnson reiterating that mastercard time resulted in underpayments for picking up supplies/equipment, donning and doffing, walking to work stations after obtaining and donning gear, and cleaning and sanitizing.   The letter also states that the second meal period is not a

bona fide meal period and is not excludable from hours of work. (Exhibit JJ at 2-3; Exhibit GG at 6; Exhibit KK at 9.)

92.     On January 19, 2001, Wage and Hour held an educational meeting in Baltimore, MD attended by Tyson, and explained that once supplies are issued, paid time starts. (Exhibit M, Answer No. 10 (page 39); Exhibit KK at 10.)

93.     A DOL fact sheet states that poultry processors are required to pay for donning and doffing time. (Exhibit BB at 2, 4; Exhibit KK at 10.)

Pre-2000

94.     In 1997, DOL investigators informed Tyson about potential wage and hour violations involving mastercard use or clothes changing at Tyson's Jacksonville, Florida and Cumming, Georgia plants.  (Exhibit M, Answer No. 10 (page 35).)

95.     On February 10, 1998, DOL issued a fact sheet providing that there were substantial violations of FLSA overtime requirements for tasks such as donning required clothing and equipment, disinfecting before going to work stations, and cleaning clothing and equipment, and that a number of plants did not pay workers for short breaks taken during the work day. (Exhibit MM at 1-2.)

96.     In January 1996, Wage and Hour conducted an investigation of Tyson's Center Texas plant and informed Tyson that the time to put on and take off work

gear is time worked, and that Tyson should track and record the time spent on these activities. (Exhibit M, Answer No. 10 (page 32); Exhibit KK at 8.)

97.    On April 15, 1996, Wage-Hour sent Tyson a letter confirming the investigation results, which provides that, "the employees' time should begin when they start to put on the hair net, the brown jacket or any other type of garment which is necessary to perform their duties." (Exhibit M, Answer No. 10 (page 32-33); Exhibit NN at ¶¶ 1, 2.)

98.    In 1992, the Department argued that the time spent by production employees donning and doffing hard hats, earplugs, hairnets, cotton frocks, safety boots, and safety glasses is not de minimis and should be compensated. (Exhibit OO; Exhibit PP).

99.    In 1987, Wage and Hour conducted an investigation of Tyson's Green Forest, Arkansas plant and found that Tyson had violated the FLSA by failing to compensate workers for time spent acquiring smocks, putting on, cleaning, and taking off the protective clothing at both breaks, and at the end of the shift, and failing to compensate employees for time spent on the production line after the department mastercard was punched out. The investigation resulted in a negotiated administrative settlement. (Exhibit GG at 5; Exhibit M, Answer No. 10 (pages 29-31); Exhibit KK at 8.)

100. In 1986, the Department conducted an investigation of Iowa Beef Packers and asserted that time spent donning, removing, and cleaning "standard" personal protective gear, such as hard hats, earplugs and safety footwear, and time spent picking up, donning, removing, and depositing for laundering, smocks, and the waiting and walking time related to all of these activities, constitutes compensable "hours worked" under the FLSA. (Exhibit QQ; Exhibit RR.)

## II. **Discussion of Relevant Legal Authorities**

### A. **Standard for Summary Judgment**

1. Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Summary judgment is particularly appropriate when "the only genuinely disputed issue is [a] legal question." *Central Oil & Supply Corp. v. United States*, 557 F.2d 511, 515 (5th Cir. 1977).[4]

---

[4] The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir.

**B.** **Donning and Doffing by Employees of Required Sanitary and Protective Clothing and Equipment Constitutes "Work" Under the FLSA**

1.      The Fair Labor Standards Act (FLSA), 29 U.S.C. 201 *et seq.*,

generally requires employers to compensate covered employees at one and one-half

times their regular rate of pay for all hours worked in excess of forty hours in a

workweek. *See* 29 U.S.C. 207(a)(1). The statute reflects "a Congressional intention

to guarantee either regular or overtime compensation for all actual work or

employment." *Tenn. Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590,

597 (1944).[5]

2.      The FLSA does not specifically define the terms "work" or

"workweek."[6] However, the Supreme Court has construed these terms broadly. In

*Tennessee Coal,* the Court defined "work" "as meaning physical or mental exertion

(whether burdensome or not) controlled or required by the employer and pursued

necessarily and primarily for the benefit of the employer and his business." 321

U.S. at 598. The Court subsequently clarified that this definition was "not intended

as a limitation on the Act," and that even non-exertional acts, such as waiting, can

---

Nov. 3, 1981).

[5] "The question of whether a particular set of facts and circumstances constitutes work under the FLSA is a question of law." *Dade County, Fla. v. Alvarez*, 124 F.3d 1380, 1383 (11th Cir. 1997), *citing Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992).

[6] The most relevant definition, in section 3(g) of the Act, provides that "'[e]mploy' includes to suffer or permit to work." 29 U.S.C. 203(g).

be work under the FLSA. *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944); *see IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (*Armour* "clarified that 'exertion' [i]s not in fact necessary for an activity to constitute 'work' under the FLSA."), *aff'g on other grounds Alvarez v. IBP, Inc.*, 339 F.3d 894, 902 (9th Cir. 2003) (*Tennessee Coal's* "'work' term" is "[d]efinitionally incorporative" and "includes even non-exertional acts."); 29 C.F.R. 785.7 (exertion is not necessary for an activity to constitute work under the FLSA).[7]

3.     Thus, the FLSA requires an employer to compensate its employees for "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 690-91 (1946); *see* 29 C.F.R. 785.7.  In *Mt. Clemens*, the Court held that activities as simple as putting on aprons and turning on light switches are work under the Act.  This further demonstrates that the FLSA does not require a

---

[7]  The Department's longstanding regulations addressing the meaning of "hours worked" under the FLSA, 29 C.F.R. Part 785, are entitled to controlling deference. *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002) (deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) is appropriate absent notice-and-comment rulemaking in light of "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time."); *Burton v. Hillsborough County, Fla.*, 181 Fed. Appx. 829, 834 n.4 (11th Cir.) (unpub'd), *cert. denied,* 127 S. Ct. 556 (2006) (*Chevron* requires court to give "significant weight" to regulations under 29 C.F.R. Part 785).  At a minimum, these regulations are entitled to substantial deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (Administrator's FLSA interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). *See Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1342-43 (11th Cir. 2007).

threshold level of exertion for an activity to constitute work under the Act. *See Fox v. Tyson Foods, Inc.*, No. 99-BE-1612, 2002 WL 32987224, at *9 (N.D. Ala. 2002) (order adopting magistrate judge's report and recommendation) ("[T]he Supreme Court has clearly expressed its intention that the burdensomeness of the activity be disregarded in an assessment of whether the activity is 'work.'"). Rather, "even an activity which takes seconds and requires very little concentration can be work if it is pursued necessarily and primarily for the benefit of the employer." *Davis v. Charoen Pokphand (USA), Inc.*, 302 F. Supp. 2d 1314, 1322 n.8 (M.D. Ala. 2004) (internal quotations and citations omitted).[8]

4.     The donning, doffing, washing, and sanitizing activities of Blountsville employees before, during, and after their shifts processing chicken on the production line, *see* Undisputed Relevant Material Fact ("Fact") 13, 27-30, constitute work under the FLSA because they are controlled or required by

---

[8] The Tenth Circuit's contrary holding in *Reich v. IBP, Inc.*, 38 F.3d 1123, 1125-26 (1994) -- that donning and doffing standard protective gear such as safety glasses, earplugs, hard hats, and safety shoes was not work under the FLSA because it took "all of a few seconds and requires little or no concentration" -- has been effectively overruled by the Supreme Court's decision in *Alvarez*, providing that exertion is unnecessary and sustaining the Ninth Circuit's holding that donning and doffing required protective gear constitutes work under the FLSA regardless of the amount of exertion required. 546 U.S. at 25, 30; *see Garcia v. Tyson Foods, Inc.*, 474 F. Supp. 2d 1240, 1246 (D. Kan. Feb. 16, 2007) (noting that *Alvarez* significantly undermined *Reich's* holding that donning and doffing standard equipment is not work under the FLSA and suggesting that the Tenth Circuit, "if given the opportunity to revisit the issues in *Reich*, would approach its analysis of the pertinent issues differently in light of *Alvarez*"); *Lopez v. Tyson Foods*, No. 06-459, 2007 WL 1291101, at *3 (D. Neb. March 20, 2007) (adopting *Garcia's* analysis that *Alvarez* has "severely undermined" the *Reich* case).

Defendant Tyson Foods, Inc. ("Tyson") and pursued for Tyson's benefit. *See Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 911-12 (9th Cir. 2004) (donning and doffing cleanroom "bunny suits" constitutes "work" under the FLSA because it is "activity, burdensome or not, performed pursuant to [the employer's] mandate for [its] benefit as an employer.") (internal quotation marks and citation omitted).

5.    These activities are required or controlled by Tyson.  Tyson requires all employees (except live hangers) to wear, at a minimum, a cotton smock, hair net, beard net for men with facial hair, and hearing protection. Fact 17, 27.[9]  These requirements allow Tyson to comply with federal food sanitation and safety regulations, *see, e.g.,* 9 C.F.R. 416.5; 29 C.F.R. 1910.132. Fact 16.[10]  Tyson also requires certain employees to wear plastic sleeves, rubber gloves, cut-resistant gloves, hard plastic arm guards, and safety glasses. Fact 17, 19-21.  In addition, employees are required to engage in certain washing and sanitizing activities before beginning work on the production line, after each absence from their workstation, and at the end of their shifts. Fact 29-32, 48.  Tyson's policies require the employees to perform the donning, doffing, washing, and sanitizing activities on the

---

[9]  Live hangers must wear, at a minimum, hearing protection and safety goggles.  Fact 17 n.3.

[10]  The fact that some of the items Tyson requires its employees to wear are also required by federal regulations does not mean that Tyson does not control or require their performance. *See Barrentine v. Arkansas-Best Freight System, Inc.*, 750 F.2d 47, 50 (8th Cir. 1984) ("The fact that a pre-trip safety inspection is required by federal regulations does not remove the employer's control over and responsibility for this inspection.").

plant premises. Fact 26, 29-30. Violating these policies can lead to disciplinary action. Fact 33. Moreover, the environmental conditions in the plant, which may be cold or wet, and the nature of the work, which may involve handling cold or messy product, require the employees to wear additional sanitary and protective gear beyond that specifically identified by Tyson as required, including plastic aprons, rubber gloves, and cotton gloves. Fact 11, 12, 22-24.[11] Donning and doffing these items must be done on the plant premises, and therefore are controlled by Tyson. Fact 26.

6.      The donning, doffing, washing, and sanitizing that Tyson workers perform also are "pursued necessarily and primarily for the benefit of the employer." *Alvarez*, 339 F.3d at 902. These activities benefit Tyson because they allow the company to produce a sanitary and wholesome product for its customers. Fact 18, 32. For example, Tyson's personal hygiene policies, which address the wearing of required equipment, Fact 17, are designed to ensure that Tyson's products are produced in a sanitary environment and are not contaminated by bacteria or foreign objects, such as band-aids or human hair. Fact 18. In addition, donning and doffing

---

[11]  Tyson has changed its position regarding which items are required a number of times during the course of this litigation. *See* Exh. A, Answer to Interrogatory No. 6, at 13-15 (listing aprons, rubber gloves, plastic sleeves, and cotton gloves as required equipment for many employees); Exh. B, Answer to Interrogatory No. 18, at 11-14 (listing aprons and rubber gloves as required for many employees); Exh. C, Answer to Interrogatory No. 18, at 1-6. For the purposes of this Motion, the Secretary relies on Tyson's most recent statement of which items are required. *See* Exh. C, Answer to Interrogatory No. 18, at 1-6; *and* Exh. D, Supplemental Answer to Interrogatory No. 6, at 8.

these items benefits Tyson because it allows the company to comply with federal regulations. Fact 16; *see also* 9 C.F.R. 416.5; 29 C.F.R. 1910.132; *Barrentine*, 750 F.2d at 50 (employee's performance of activity required by federal regulations benefits employer). Tyson also benefits from the donning and doffing of clothing or equipment required by the environmental conditions in the plant and the nature of the work because this activity allows the employees to perform their work more efficiently. Fact 22-24.

7.     Tyson is the primary beneficiary of the employees' donning, doffing, washing, and sanitizing activities, even though the employees may receive some benefit from these activities as well. *See Barrentine*, 750 F.2d at 50 (the driver of the vehicle, the employer, the trucking industry, and the public benefit from safety inspection and repair).

8.     Under these facts, the donning, doffing, washing, and sanitizing activities at issue in this case clearly constitute work under the FLSA. *See Alvarez*, 339 F.3d at 902, *aff'd*, 546 U.S. 21 (2005) (meat processing employees' donning and doffing of required smocks, hardhats, hairnets, earplugs, face shields or safety glasses, gloves, plastic sleeves and leggings, aprons, and safety boots and shoes are "work"); *Tum v. Barber Foods, Inc.*, 360 F.3d 274, 277, 279 (1st Cir. 2004), *aff'd, in part, on other grounds*, 546 U.S. 21 (2005) (poultry processing workers donning and doffing required lab coats, hairnets, earplugs, safety glasses, steel-toed boots,

aprons, and gloves was compensable work under the FLSA); *Fox*, 2002 WL

32987224, at *9 (order adopting magistrate judge's report and recommendation)

(poultry workers' donning and doffing of protective clothing and equipment

qualifies as "work"); *Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912, 923

(N.D. Ill. 2003) (meat processing employees' "donning and doffing of sanitary and

safety equipment, equipment cleaning and knife sharpening constitute work")

(internal quotation marks and citation omitted).  Tyson's failure to compensate its

employees for all the time they spend performing these activities violates the FLSA.

## C.     The Donning and Doffing Activities Are Integral and Indispensable to the Employees' Principal Activities

1.      The Portal-to-Portal Act of 1947, 29 U.S.C. 251 *et seq.* ("Portal Act"),

creates a limited exception to the FLSA's general rule that an employer must

compensate its employees for all hours worked.[12]  Section 4 of the Portal Act, 29

U.S.C. 254, relieves an employer of responsibility for compensating employees for

travel and other "preliminary" and "postliminary" activities "which occur either

prior to the time on any particular workday at which such employee commences, or

---

[12] The Portal Act, which was passed in response to *Mt. Clemens* and relieves employers of
liability from compensating employees for certain preliminary and postliminary activities, does
not change the definition of "work" or "workweek" under the FLSA. *See Alvarez*, 546 U.S. at 28
("Other than its express exceptions for travel to and from the location of the employee's 'principal
activity,' and for activities that are preliminary or postliminary to that principal activity, the
Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the terms
'work' and 'workweek,' or to define the term 'workday.'"); *see also* 29 C.F.R. 785.7 (same).

subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. 254(a).[13]

2. By its terms, the Portal Act only excludes preliminary and postliminary activities when they occur outside the workday, which is defined as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F.R. 790.6(b);[14] *see* 29 U.S.C. 254(a); *Alvarez*, 546 U.S. at 28-29. This principle, known as the "continuous workday" rule, requires an employer to pay an employee for any activity that occurs between the first and last principal activities of the employee's workday. *See Alvarez*, 546 U.S. at 28, *quoting* 29 C.F.R. 790.6(a).[15]

---

[13] The activities specified by the Portal Act as noncompensable are: "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. 254(a)(1) and (2).

[14] The regulations at 29 C.F.R. Part 790, which the Department promulgated in 1947, 12 Fed. Reg. 7655 (Nov. 18, 1947), were ratified by Congress in 1949 when former Section 16(c) of the FLSA was enacted. *See Steiner v. Mitchell*, 350 U.S. 247, 255 n.8 (1956) (quoting Section 16(c) to the effect that existing Wage-Hour regulations and interpretations were to remain in effect unless inconsistent with the amendments, 63 Stat. 920 (1949), 29 U.S.C. 208 (note)). Like the Department's regulations at 29 C.F.R. Part 785, *see* note 7, *supra*, the regulations at 29 C.F.R. Part 790 are also entitled to deference.

[15] The "de minimis" rule has nothing to do with whether an activity begins or ends the workday for purposes of the Portal Act. Instead, under the language of that Act, any "principal activity" can begin and end the workday, regardless of how long that activity takes to perform. 29 U.S.C. 254(a); *see* 93 Cong. Rec. 2297, 2298 (1947) (statement by Senator Cooper that an employee's pre-shift activity of handing out clothes in the morning would be a "principal activity" whether it took "15 or 10 minutes or five minutes or any other number of minutes."); 29 C.F.R. 790.8(b) n.63 (construing legislative history to indicate that "any amount of time" will suffice). The examples cited in the regulations of picking up tools or receiving instructions before traveling to a work site demonstrate that the amount of time devoted to an activity is not material in determining whether it is a principal activity that starts the workday. *See* 29 C.F.R. 790.8(b).

3.      The Portal Act was designed to "preserve to the worker the rights he

has gained under the Fair Labor Standards Act." 29 C.F.R. 790.2(a), *quoting*

*statement by Senator Cooper*, 93 Cong. Rec. at 2300.  Consistent with this

congressional intent, the terms "principal activity or activities" must be construed

liberally "to encompass any work of consequence." *Dunlop v. City Elec., Inc.*, 527

F.2d 394, 398 (5th Cir. 1976); *see* 790.8(a) (same).  As the former Fifth Circuit

explained, "the excepting language of § 4 was intended to exclude from F.L.S.A.

coverage only those activities predominantly spent in the employee's own interests.

No benefit may inure to the company." *Dunlop*, 527 F.2d at 398 (internal quotation

marks and citations omitted).

4.      The Supreme Court has held that "any activity that is 'integral and

indispensable' to a 'principal activity' is itself a 'principal activity' under § 4(a) of the

Portal-to-Portal Act," and therefore is compensable under the FLSA. *Alvarez*, 546

U.S. at 37, *relying on Steiner*, 350 U.S. at 256 ("[A]ctivities performed either before

or after the regular work shift, on or off the production line, are compensable under

the portal-to-portal provisions of the Fair Labor Standards Act if those activities are

an integral and indispensable part of the principal activities for which covered

workmen are employed and are not specifically excluded by Section 4(a)(1).").

Such an activity commences the continuous workday, and marks the beginning of

compensable time. *See Alvarez*, 546 U.S. at 37; *Bonilla*, 487 F.3d at 1342 (if

employees "engag[e] in work-related activity that is 'integral and indispensable' to their work," then travel occurring after such activity is compensable) (citing *Alvarez*); *see also* Wage and Hour Advisory Memorandum No. 2006-2, at 2 (May 31, 2006).[16]

5.     An activity is integral and indispensable to a principal activity if it is "performed as part of the regular work of the employees in the ordinary course of business." *Dunlop*, 527 F.2d at 401. This essentially is a functional test, focusing on the relatedness of the activity to the primary duties of the job. *See* 29 C.F.R. 790.8(c) ("Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance."). This Circuit has identified three factors that courts should consider in determining whether an activity is integral and indispensable to a principal activity, and therefore compensable under the FLSA as amended by the Portal Act. These factors are: "(1) whether the activity is required by the employer, (2) whether the activity is necessary for the employee to perform his or her duties, and (3) whether the activity primarily benefits the employer." *Bonilla*, 487 F.3d at 1344 (citing *Dunlop*, 527 F.2d at 401); *accord Bobo v. United States*, 37 Fed. Cl. 690, 693 (Fed. Cl. 1997).

---

[16] Like the Secretary's regulations, the Advisory Memorandum is also entitled to deference. *See* note 7, *supra*; *see also Long Island Care at Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007) (Wage and Hour Advisory Memorandum addressing FLSA's companionship services exemption not entitled to less deference simply because it was issued to internal Department personnel or appears to have been written in response to litigation).

6.     The Supreme Court has specifically held that changing into old clean work clothes and showering on an employer's premises can be integral and indispensable to an employee's principal activities. *See Steiner*, 350 U.S. at 248, 254-58  In so holding, the Court found "persuasive" Senator Cooper's colloquy with several other Senators during debate on the bill and took the unusual step of attaching it as an appendix to its opinion. *Id.* at 254 & n.5.  Senator Cooper stated, "[I]f the employee could not perform his activity without putting on certain clothes, then the time used in changing into those clothes would be compensable. . . ." *Id.* at 258.  The Court also based its interpretation on the regulation at 29 C.F.R. 790.8, which provides, in part, that changing clothes on the employer's premises is compensable where it is required by the employer, the law, or the nature of the work. *See id.* at 255 n.9 (citing 29 C.F.R. 790.8(c) n. 65).[17]

---

[17] The Second Circuit's recent decision in *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 594-95 (2007) (petition for reh'g filed July 11, 2007), that nuclear power plant employees' donning and doffing of "generic" protective gear, including a helmet, safety glasses, and steel-toed boots, is not integral to the employees' principal activities, is squarely at odds with the Supreme Court's decisions in *Steiner* and *Alvarez*, which relied on the Ninth Circuit's holding that donning and doffing such "non-unique" gear was integral and indispensable to the employees' principal activities. *See* 339 F.3d at 903 ("[E]ase of donning and ubiquity of use do not make the donning of such equipment any less 'integral and indispensable' as that term is defined in *Steiner*."). Contrary to the *Gorman* court's suggestion, *see* 488 F.3d at 593, donning and doffing protective clothing can be integral and indispensable even in "non-lethal" situations. Indeed, as the Supreme Court observed in *Steiner*, 350 U.S. at 254-55, Section 3(o) of the FLSA, which excludes clothes changing and washing time from "hours worked" if such time is excluded "by the express terms of or by custom or practice under a bona fide collective-bargaining agreement," 29 U.S.C. 203(o), clearly contemplates that where such time is not excluded by a collective bargaining agreement, clothes changing can be compensable hours worked "if the changing of clothes or washing is indispensable to the performance of the employee's work or is required by law or by the rules of the employer." 29 C.F.R. 785.26. Section 3(o) was enacted, in part, as a response to concerns from the bakery industry that the Portal Act would not insulate the

7.    Most recently, in *Alvarez*, the Supreme Court reaffirmed this precedent in the context of donning and doffing sanitary and protective equipment in a poultry processing plant like Defendant's.  The questions presented in *Alvarez* were whether the Portal Act excluded the time employees spent (1) walking between a changing area where they donned and doffed sanitary and protective gear and the production area, and (2) waiting to put on this gear.  546 U.S. at 24.  Both appellate courts in the consolidated cases the Court was considering had determined that donning and doffing the required sanitary and protective gear was integral and indispensable to the poultry and meat processing employees' principal work activities.  *See Tum*, 360 F.3d at 279; *Alvarez*, 339 F.3d at 903.  The unanimous Court accepted the lower courts' determinations, and held that such integral and indispensable activities were themselves principal activities that commenced the continuous workday.  *Alvarez*, 546 U.S. at 32-33.

8.    The donning and doffing activities at issue here are integral and indispensable to the employees' principal activity of processing chicken.  *See Dunlop*, 527 F.2d at 401.  First, as discussed in Section B, *supra*, Tyson requires

---

largely unionized industry from post-1947 actions brought by bakery workers seeking
compensation for clothes-changing and washing time.  *See Hearings before a Subcomm. of the Senate Comm. On Labor and Public Welfare*, 81st Cong., 1st Sess., on S. 58, S. 67, S. 92, S. 105, S. 190, S. 248, and S. 653, p. 815, at 815-17, and p. 1173, at 1175-79 (1949) (Memorandum on behalf of Pennsylvania Bakers Association; Letter of William A. Quinlan, General Counsel, Associated Retail Bakers of America).  This demonstrates that compensability for clothes changing under the Portal Act was not meant to be limited to "lethal" or even highly toxic circumstances.

nearly all of its Blountsville employees to obtain and don at least smocks, hairnets, beard nets if they have facial hair, and hearing protection on Tyson's premises before they begin their primary work of processing chicken. Fact 13, 17, 19, 27, 38. Employees are not allowed to wear these items outside the plant, Fact 26, and can be disciplined for failing to wear them. Fact 33. Such facts "weigh heavily in favor of a determination that the activity is not excluded by the Portal-to-Portal Act." *Ballaris*, 370 F.3d at 911 (citing *Dunlop*, 527 F.2d at 399-401).

9. Even donning and doffing items that Tyson claims it does not expressly require, such as plastic aprons, rubber gloves (in some cases), and cotton gloves, constitute integral and indispensable activities. Where, as here, the nature of the work requires donning and doffing "additional" equipment, *see* Fact 11, 12, 22-24, 28, such donning and doffing is integral and indispensable to the employees' principal activities. *See* 29 C.F.R. 790.8(c) n.65; *see also Steiner*, 350 U.S. at 250-53. Moreover, the proper performance of the employees' jobs requires that they don any "additional" equipment before they begin processing chicken. Fact 28. This, too, renders the activity integral and indispensable. *See Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 718 (2d Cir. 2001) ("If the proper performance of [the employees'] job required the preparatory work to be completed when the first walk-in patient could potentially arrive, this time should have been counted, regardless of whether anybody specifically instructed them to arrive

early.") (citing *Mitchell v. King Packing Co.*, 350 U.S. 260, 263 (1956) (knife-sharpening done by knifemen at a meat packing plant was integral and indispensable to employees' principal activities because knives had to be "razor sharp" for proper performance of the work)).

10.     Second, the employees' donning and doffing, as well as obtaining their gear, are necessary for them to perform their duties processing chicken on the production lines. Fact 13, 15, 27-29. Pursuant to Tyson's personal hygiene, safety, and other policies and practices, employees cannot perform their work on the line processing chickens unless they are wearing their required protective gear. Fact 16, 17, 19, 27, 28, 33. Federal food sanitation and safety regulations also prohibit employees from working without wearing their required gear. Fact 16. Finally, the nature of the work and the plant conditions at Blountsville require employees to don and doff certain sanitary and protective equipment. Fact 22-24. Because Tyson employees cannot perform their principal activity of processing chicken without obtaining and donning sanitary and protective gear, obtaining and donning is integral and indispensable to the employees' principal activities. *See* 29 C.F.R. 790.8(c); Wage Hour Advisory Memorandum No. 2006-2, at 1; *Brock v. Mercy Hosp. & Med. Ctr.*, No. 84-1309, 1986 WL 12877, at *6 (S.D. Cal. 1986) (donning and doffing uniforms was integral and indispensable to employees' principal activities where employees were not permitted to work without wearing the

uniforms, and "the functioning of the hospital[] would be adversely affected in important respects if affected employees did not wear uniforms identifying them as hospital employees and as to assigned job").

11.     Third, employees engage in these activities primarily for Tyson's benefit.  The employees wear sanitary and safety gear to ensure that Tyson makes a sanitary, wholesome product for its customers.  Fact 18, 32.  The employees also wear this gear so that Tyson remains in compliance with federal regulations.  Fact 16.  Moreover, employees wear the gear so that they can perform their work more effectively in the cold, wet, and messy conditions at the plant.  Fact 22-24.  Thus, "'at both broad and basic levels,'" these activities are "performed for the 'benefit of [the company].'"  *Ballaris*, 370 F.3d at 911 (quoting *Alvarez*, 339 F.3d at 903).  "The fact that the employees too may have benefitted" from these activities "is not inconsistent with the conclusion that the work was an integral and indispensable function of the defendant business."  *Dunlop*, 527 F.2d at 400 n.11 (internal quotations and citations omitted); *see Steiner*, 350 U.S. at 251 (employees' showering at the end of shifts was integral and indispensable to the employees' principal activities, as company foreman admitted that the showering "protects the company and the employee both").

12.     Because Tyson employees' donning and doffing "is necessary to the business and is performed by the employees, primarily for the benefit of the

employer, in the ordinary course of that business," it is a "principal" activity.
*Dunlop*, 527 F.2d at 401.  Moreover, "[s]ince, like donning, obtaining the gear . . .
'is always essential if the worker is to do his job,'" Tyson employees' compensable
day starts "once the employee has obtained the gear required to be stored on the
premises by taking an item out of a bin, a locker, or another designated storage
area."  Wage Hour Advisory Memorandum No. 2006-2, at 1 n.1; *see Tum*, 331 F.3d
at 9 ("donning includes obtaining the item").  All time between this first principal
activity and the employees' last principal activity, including walking time (but not
including bona fide meal periods), is part of the continuous workday and is not
subject to the Portal Act's exclusion from compensable time.  *Alvarez*, 546 U.S. at
37.  Thus, Tyson must pay its employees from the moment they retrieve their first
piece of required gear, such as a smock, until they dispose of their last piece of
required gear.

13.     Tyson has violated and continues to violate the FLSA because it does
not generally pay its employees from the time they obtain their first piece of
required gear until they dispose of their last piece of required gear.  Fact 39, 44-47,
50-52.  Rather, Tyson only begins to pay employees at the scheduled start of their
shift, Fact 39, which is at or near the time the employees begin processing chicken.
Fact 41.  This practice results in employees not being paid for all hours worked, in
violation of the FLSA, as amended by the Portal Act.  Fact 46, 47, 50-52.

**D.** **Tyson Cannot Rely on a "De Minimis" Defense to Avoid Paying its Employees for Time Regularly Spent Donning and Doffing**

1.      The Supreme Court in *Mt. Clemens* recognized that employers do not need to pay employees for otherwise compensable time if that time is "de minimis." *See Mt. Clemens*, 328 U.S. at 692 ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded.").[18]  Pursuant to the Department's implementing regulation, the narrow "de minimis" exception "applies *only* where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities." 29 C.F.R. 785.47 (emphasis added).  If it is feasible for the employer to record the time, then the employer cannot escape liability for paying its employees for this time by relying on the de minimis rule. *See id.* ("An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him."); *see also* Wage and Hour Opinion Letter, 1993 WL 901156 (Mar. 19, 1993) ("Even if the time so spent is not great, but can be ascertained, it must be considered hours worked for purposes of the FLSA.").  The same is true if the time at issue is fixed or regular. *See* 29 C.F.R.

---

[18]  Since the de minimis rule provides employers a defense to paying for otherwise compensable time under the FLSA, Tyson has the burden of proof on this issue. *See, e.g., Mercy Hosp. & Med. Ctr.*, 1986 WL 12877, at *5.

785.47 (de minimis defense only applies where activity involves "uncertain and indefinite periods of time").

2.    In applying the Department's regulation, courts generally look to three factors to determine whether a claim for uncompensated time is de minimis:     "1) the practical administrative difficulty of recording the additional time; 2) the size of the claim in the aggregate; and 3) whether 'the claimants performed the work on a regular basis.'" *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984)); *see also Burton*, 181 Fed. Appx. at 838.  As the Ninth Circuit stated in *Lindow*, "[t]here is no precise amount of time that may be denied compensation as *de minimis*."  738 F.2d at 1062.

3.    In this case, it is undisputed that Tyson has a timekeeping system that records the time Tyson employees clock in and out each day.  Fact 34, 35.  This timekeeping system, Perstime, which can track time in increments as small as hundredths of an hour, demonstrates that it is administratively feasible for Tyson to record all the time its employees spend working.  Fact 35.  Even though the employees' pre-shift and post-shift activities may not be performed in any prescribed manner and the actual time spent by employees may vary depending on a number of factors, Fact 38, 46-48, 52, this is not sufficient to establish that, "in this day of modern technology, [Tyson] cannot record the compensable work performed

by its employees." *Reich v. IBP, Inc.*, No. 88-2171, 1996 WL 137817, at *7 (D.

Kan. 1996) (citing *Saunders v. John Morrell & Co.*, No. C88-4143, 1992 WL

531674 (N.D. Iowa 1992)). Indeed, Tyson already pays some employees based on

their clock in times. Fact 40.

      4.     A basic principle under the FLSA is that employers are responsible for

the recording of time. As the Supreme Court observed in *Mt. Clemens*, "it is the

employer who has the duty under § 11(c) of the Act [29 U.S.C. 211(c)] to keep

proper records of wages, hours and other conditions and practices of employment."

328 U.S. at 687. Accordingly, the employer must structure its operations in a

manner that permits the accurate recording of this time. *Cf. Vega v. Gasper*, 36 F.3d

417, 427 (5th Cir. 1994) (where employees are forced to wait because of the

inefficiencies of the employers' payroll system, that waiting time is compensable).

Here, Tyson fails to accurately record time employees spend donning, doffing,

washing, and sanitizing. Fact 44, 51.

      5.     One of Tyson's main competitors in the poultry processing industry,

Perdue Farms, entered into a settlement agreement with the Department in May

2002 whereby it records and pays for all time its employees spend donning, doffing,

and sanitizing required equipment. Fact 53. Accordingly, it is administratively

feasible for Tyson to record the time its employees spend donning and doffing, and

therefore, Tyson cannot rely on the de minimis rule to avoid paying for this time.

*See Fast v. Applebee's Int'l., Inc.*, No. 06-4146, 2007 WL 1309680, at *9 (W.D. Mo. May 3, 2007) (denying de minimis defense because, "even if the amount of time is small, it could easily be measured").

6.    As *Lindow's* second factor makes clear, the de minimis rule does not apply separately to each particular activity viewed in isolation. A de minimis determination instead requires consideration of the aggregate amount of time for which an employee seeks compensation. *See Alvarez*, 546 U.S. at 39, 42; *Lindow*, 738 F.2d at 1063; *Dunlop*, 527 F.2d at 401; Wage Hour Advisory Memorandum No. 2006-2, at 3.[19] This is because "independent *de minimis* determinations of each task would rarely result in findings of compensable time – work can always be subdivided into small enough tasks to be considered *de minimis*." *Reich v. IBP, Inc.*, 1996 WL 137817, at * 6. Here, the size of the Secretary's aggregate claim, which involves daily donning and doffing activities over a seven year period for thousands of current and former employees, cannot be considered de minimis under any meaning of the word.

---

[19]  The Ninth Circuit in *Lindow* did not state definitively what it meant by aggregating time. It did state that "[a]n important factor in determining whether a claim is *de minimis* is the amount of daily time spent on the additional work." 738 F.2d at 1062. The Ninth Circuit, however, also cited to other cases where time has been aggregated beyond a daily basis (ranging up to three years). *Id.* at 1063 ("Courts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim."). The court also pointed to cases where time was aggregated "in relation to the total sum or claim involved in the litigation." *Id.*; *see also Reich v. Monfort, Inc.*, 144 F.3d 1329, 1334 (10th Cir. 1998) (post-*Lindow* case where court stated that "[i]t is also appropriate to consider an aggregate based on the total number of workers").

7.      Finally, the time Tyson's employees spend donning and doffing each day cannot be deemed de minimis because these activities occur regularly each work day.  Fact 38, 48.  The de minimis rule does not apply where the activities at issue are regular, recurring events that employees perform each and every day.  *See Kosakow*, 274 F.3d at 719 (no de minimis defense where employee needed to arrive 15 minutes early every day).  Thus, Tyson's de minimis defense fails on this ground as well.

**E.      Tyson Improperly Deducted a Second 30 Minute Break Period from the Wages of Eight-Hour Shift Employees**

1.      Breaks are work under the FLSA if they are predominantly for the employer's benefit.  *Kohlheim v. Glynn County, Georgia*, 915 F.2d 1473, 1477 n. 19 (11th Cir. 1990); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1411-12 (5th Cir. 1990).  *See Alvarez*, 546 U.S. at 25; *Tenn. Coal,* 321 U.S. at 598; *Dade*, 124 F.3d at 1384.  Thus, a break is compensable unless the break period is long enough to enable the employee "to use the time effectively for his own purposes. . . Whether the time is long enough to enable him to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case."  29 C.F.R. 785.16(a).  *Cole v. Farm Fresh Poultry*, 824 F.2d 923, 925, 927-929 (11th Cir. 1987), *Mireles*, 899 F.2d at 1411; *see Birdwell*, 970 F.2d at 807 ("whether employees are working . . . depends on the degree to which the employee may use the time for personal activities.")

2.      Defendant requires employees to take two 30 or 35-minute unpaid breaks per eight-hour work shift. Fact 54. The first break begins two and a half to three hours after the start of the employee's shift, and the second break begins two and a half to three hours after the end of the first break. Fact 63, 64. One of the two breaks constitutes compensable work time because it predominantly benefits the employer and the employees cannot use the time effectively for their own purposes.[20]

3.      As a matter of law, the break is compensable because employees cannot use the time effectively for their own purposes. In *Farm Fresh Poultry*, 824 F.2d at 925-929, the Eleventh Circuit required the employer, a chicken processing plant-employer, to compensate production employees for breaks lasting thirty minutes or more, because employees needed at least one hour to use the break time effectively for their own purposes. Some employees lived in the vicinity and went home during the breaks; however, most employees lived 10 to 20 minutes from the plant, carpooled to work, and waited in the break room at the plant during break time. Others who could find transportation occasionally went to a local convenience store.[21] *See Birdwell*, 970 F.2d at 810 (citing *Farm Fresh Poultry* as an

---

[20] One of the thirty-minute breaks is a bona-fide, non-compensable meal period, to the extent that employees are completely relieved from duty. 29 C.F.R. 785.19(a). *See Kolheim*, 915 F.2d at 1477.

[21] The fact that some employees <u>occasionally</u> receive a legitimate break does not preclude a finding that the breaks predominantly benefit the employer. *See Hartsell v. Dr. Pepper Bottling*

example of "severely restricted" compensable off-duty time); *Mireles*, 899 F.2d at

1411-13 (15- to 45-minute break too short for employees to use the time for their

own purposes -- although employees not required to remain on the premises, most

employees commuted to work and the nearest store was one and a half to two miles

away); *Aeromotive Metal Products, Inc. v. Wirtz*, 312 F.2d 728, 729 (9th Cir. 1963)

(break compensable where homes and commercial area not accessible within the

break-time period, and majority of employees stayed in the vicinity of the plant,

smoking, having refreshments, etc.); *Chavez v. IBP, Inc. and Tyson Foods, Inc.*, No.

CV-01-5093-RHW, slip op. at 34-36 (E.D. Wash. May 16, 2005) (60 minutes

insufficient where Tyson employees do not have time to return home or run errands,

even though employees go outside and smoke, watch television in the cafeteria, and

have access to an educational center in the plant with ten computers); *Goldberg v.*

*Willmark Serv. Sys., Inc.*, 215 F. Supp. 577, 585-86 (D. Minn. 1961) (breaks of up

to two hours compensable, where employees do not have sufficient time to attend to

"their own personal affairs or comfort"), *aff'd*, 317 F.2d 486, 490 (8th Cir.), *cert.*

*denied*, 375 U.S. 897 (1963).

    4.    Here, less than four percent of all employees leave the facility during

the breaks.  Fact 69.[22]  The plant is in a rural part of Alabama, approximately two

_____

Co., 207 F.3d 269, 274 (5th Cir. 2000).

[22] As discussed below, employees must clock out and back in if they wish to leave the facility
during the break; thus, this figure was derived from Tyson's electronic time clock punch records

miles from the town of Blountsville. Fact 70.  There are no sidewalks and little

residential housing within walking distance of the plant.  Fact 71.  Similar to the

employees in *Farm Fresh Poultry*, *Mireles*, and *Chavez*, many employees live too

far from the plant to go home during the breaks -- in this case more than 35 minutes

away -- and there is no public transportation available. Fact 71-74, 76.  On second

and third shifts, most businesses are closed when breaks occur.  Fact 64, 75.[23]  As in

*Farm Fresh Poultry*, *Mireles*, and *Chavez*, most employees stay at the plant and use

the restroom, eat, smoke, make telephone calls on a pay phone or plant telephone,

watch television, or talk with each other in the cafeteria or in one of the break rooms

or outdoor break areas, or take care of personnel matters.  Fact 66, 69.  Employees

cannot attend to personal affairs within the plant because there are only some pay

phones and a house phone available to employees.  Fact 82.  Employees may not use

cell phones and there is no computer access. Fact 82.

     5.    Even those employees who work on the first shift rarely leave the

plant as there is insufficient time for them to do so.  Fact 29-31, 67-74, 76-81, 83-

86.  At the start of the break, employees are encouraged to wash their hands to

prevent the spread of bacteria after handling raw chicken.  Fact 80.  Sometimes, they

wait in line at a wash station.  Fact 81.  Employees must also take off their gloves,

---

for the period October 15, 2000 to July 3, 2006.  Fact 67, 69.

[23]  Breaks are scheduled at 6:30p.m., 7:00p.m., 9:30pm, 10:00 p.m., 12:30a.m. and 3:00a.m. Fact 64.

aprons and sleeves (if they wear them) before they leave the production area. Fact 77. Smocks must be dropped into a disposal bin and aprons hung on a hook located near the production areas before leaving the facility. Fact 78. If required equipment is soiled or torn, employees typically replace it at the equipment window. Fact 79.[24] After the break, employees are required to follow a detailed sanitizing procedure for cleaning their hands, gloves, aprons and sleeves. Fact 29-31. Contaminated outer garments must "be changed as often as necessary to maintain cleanliness." Fact 86. If employees leave the facility, they must clock out and walk through the parking lot to their cars, which can take from five to ten minutes. Fact 67, 84.[25] Employees are encouraged to use the restroom during breaks to minimize the time away from the line during production (Fact 83), and must perform personal hygiene. *See supra.*

6.    Tyson predominantly benefits from the break, because its purpose is to assure that employees do not work more than two and a half to three hours at a time for safety and ergonomic reasons, including prevention of repetitive motion injuries. Fact 56, 57, 63, 65. In *Steiner*, 350 U.S. at 248-251, 256, employees were required to change clothes at the beginning of the shift, and shower at the end of the shift, in accordance with industry standards, to protect themselves from dangerous chemicals encountered in their work. This time was found compensable as it benefitted the

---

[24]  Gloves, aprons and sleeve covers are not permitted in the restrooms. Fact 85.

[25] Employees who are late returning to their work station after a break can be disciplined. Fact 68.

employer as well as the employee. Here, Tyson mandated regular breaks, in accordance with industry standards, to prevent injuries that are harmful to the worker, but also adversely affect both production and presumably its worker compensation insurance rates. Fact 56, 57, 63, 65. Tyson's Safety Orientation Sheet provides that "[i]t is in your interest as well as ours that you remain safe and healthy and able to contribute to our continued success." Fact 65. *See Alvarez*, 126 S. Ct. at 521; *Mitchell v. Turner*, 286 F.2d 104, 105 (5th Cir. 1960) (one factor in determining compensability of break is whether the work is "monotonous, repetitious, tedious and tiring"); *Mitchell v. Greinetz*, 235 F.2d 621, 622-25 (10th Cir. 1956) (breaks compensable because of benefits to the employer -- particularly the increased efficiency of employees who engaged in "monotonous and tiring" hand loom operation); *Brock v. Claridge Hotel & Casino*, 664 F. Supp. at 899, 907-08 (D.N.J. 1986) (mandatory breaks primarily benefitted the employer where primary purpose was to maintain worker productivity), *remanded on other grounds*, 846 F.2d 180 (3d Cir.)[26], *cert. denied*, 488 U.S. 925 (1988).

7.     The breaks also benefit Tyson by allowing it to clean and sanitize the plant. *See Charoen Pokphand*, 302 F. Supp. 2d at 1327 (break periods predominantly benefit poultry processor-employer by allowing it to comply with

---

[26] The Third Circuit agreed with the district court on the merits of the case. *Claridge Hotel*, 846 F. 2d at 189.

sanitation regulations); *Chavez*, slip. op. at 37-38 (breaks between shifts primarily benefitted Tyson where they provided Tyson an opportunity to clean the processing floor while the line was not operating). Specifically, Tyson uses the break time to wash down the equipment and floors. Fact 58-61. In Evisceration there is a full wash down of the equipment and the floors to rid the floor of blood, guts, or other undesirable buildup. Fact 58.[27] In other processing locations, there is a general wash-down, consisting of washing the floors and getting the fat and excessive build-up off the floors, or spraying down the equipment and floors. Fact 59. Wash-downs of equipment and surfaces that the chicken may contact cannot occur while the line is running. Fact 60. High pressure hoses cannot be used while production is occurring because it produces a mist that can cause cross-contamination. Fact 60.[28] Thus, only during break times do sanitation employees clean the plant with water and chemicals, and wash surfaces and equipment, to ensure that the plant is clean, reduce bacteria, and prevent mold. Fact 60, 61. Indeed, according to plant manager Cagle, bacteria in the product would be bad for business. Fact 62.

---

[27] USDA regulations require a wash down no less often than every 5-1/2 hours. Fact 58.

[28] Floor rinsing is discouraged during production, but if it is necessary, it is done with cold water on low pressure that does not create aerosol spray, mist or condensation. Fact 60.

8.    The second break is not compensable even if Tyson now attempts to characterize the break as a "meal period."[29] Scheduling two meal periods within an eight hour shift is unusual. *See Claridge Hotel*, 664 F. Supp. at 908; August 30, 1982 Opinion letter. When two meal periods are required, both must occur within a specified period at a time of day which, in light of the employee's working hours, is suitable for a normal meal period. November 7, 1994 (1994 WL 1004880), August 30, 1982 Opinion letters. The limited time between the two breaks shows that both breaks are not set aside for regular meals, as workers do not ordinarily eat two meals at two and a half hour intervals. Further, for the second break to be noncompensable, it must meet the Secretary's test at 29 C.F.R. 785.16(a), that the employee must be able to "use the time effectively for his own purposes." Wage and Hour Opinion letters dated November 7, 1994, August 30, 1982, October 13, 1964.[30] *See Claridge Hotel*, 664 F. Supp. at 908 (fact that workers may have used second 30 minute break to eat does not convert it into a bona fide meal period). Here, the employees could not effectively use the break time for their own purposes; hence, one of the breaks is non-compensable.

---

[29]  According to plant manager Cagle, Tyson does not designate the breaks as "meal periods." Rather, "[t]hey are just 30-minute break periods." Fact 55.

[30] The Administrator's opinions are entitled to deference as they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Dade County*, 124 F. 3d at 1385, *citing Skidmore*, 323 U.S. at 140.

**F.    Tyson Is Not Entitled to the Good Faith Defense Provided by Section 259 of the Portal Act**

1.    The Portal Act contains a "good faith" defense which bars liability for FLSA violations if the employer's action was (1) taken in good faith (2) in conformity with and (3) in reliance on a written administrative interpretation, or administrative practice or enforcement policy of the Administrator of the Wage and Hour Division.  29 U.S.C. 259(a), (b)(1).  *See Farm Fresh Poultry*, 824 F.2d at 926; 29 C.F.R. 790.13(a).  None of these requirements is met here.

2.    Before an employer may rely on an administrative practice or enforcement policy "there must be evidence of its adoption by the agency through some affirmative action establishing it as the practice or policy of the agency."  29 C.F.R. 790.18(h).  *See Equal Employment Opportunity Comm'n v. Home Insurance Co.*, 672 F.2d 252, 265-66 (2d Cir. 1982) (employer must show that there was affirmative action by the agency).  [*Cf. United States v. American Union Transports*, 327 U.S. 437, 455 (1946) ("'Authority . . . cannot evaporate through lack of administrative exercise.'"), *quoting Federal Trade Commission v. Bunte Bros.*, 312 U.S. 349, 352 (1941);]

3.    Here, the Administrator has not adopted an administrative policy or an enforcement practice, contrary to the positions taken on any issues in this litigation, upon which Tyson could rely.  See discussion *infra*.  This Court already has found that no such policy or practice existed:

> Contrary to Tyson's assertion, there is no indication that the DOL has changed its position concerning these issues [of donning and doffing time and second meal-period time]. At best, Tyson can assert only that the DOL's non-enforcement of the FLSA with respect to "donning and doffing" time since 1948 rises to the level of some implicit policy or practice. But non-action, absent anything else, cannot be equated with the formation of an official policy or practice.

(Report and Recommendation of Magistrate Putnam dated 4/3/03, pp. 6,8; Order Adopting Report and Recommendation, dated 7/17/06).

Indeed, the Administrator has enforced the compensability of donning, doffing and related walking time in the food processing industry since at least 1986. Fact 100. See *infra*.

4.      Further, the Administrator's regulations explicitly require employers to compensate employees for changing clothes on the employer's premises when it is required by law, by rules of the employer, or by the nature of the work. 29 C.F.R. 790.7(g) n. 49; 790.8(c) n.65; 29 C.F.R. 785.24-785.26.   At a minimum, Tyson requires its employees to change into smocks, hairnets (since 2003), and beard nets where appropriate. Fact 26, 27.  Certain employees are required to put on plastic sleeves, rubber gloves, cut-resistant gloves, hard plastic arm guards, and safety glasses. Fact 28.

5.      Additionally, since at least 1949, Administrator's opinion letters have made clear that clothes changing on the employer's premises is compensable, consistent with the regulations cited above.  For example, a 1973 Administrator's opinion letter ruled clothes changing compensable where the clothing was required

for sanitary purposes and could not be worn outside (July 12, 1973 Opinion Letter).

It was not de minimis as the changing was performed regularly, during practically

ascertainable periods of time. *See* 29 C.F.R. 785.47.  An opinion letter issued on

June 21, 1993 applied the same principles to find "negligible" time spent changing

shoes or shoe covers compensable. *See* June 21, 1993 Opinion Letter; *see also*

March 9, 1949 Opinion Letter (changing clothes and washing required by the nature

of the work, the law or the employer compensable); May 8, 1950 Opinion Letter

(changing clothes compensable when part of principal activity per section 790.8(c)

of bulletin (now 29 C.F.R. 790.8(c)); February 28, 1961 Opinion Letter (if

employee cannot perform duties without changing clothes on employer's premises,

changing compensable); January 25, 1962 (changing clothes in turkey processing

plant compensable); March 14, 1967 Opinion Letter (washing and changing clothes

compensable if required by employer, nature of job or statute).

      6.     Similarly, in *Reich v. Monfort, Inc.*, 1995 WL 817796 (D. Colo. 1995),

*aff'd in part, rev'd in part*, 144 F.3d 1329 (10th Cir. 1998) and *Reich v. IBP, Inc.*, the

Secretary argued in enforcement proceedings against meatpacking companies that

donning and doffing hard hats, earplugs, hairnets, cotton frocks, safety boots, and

safety glasses, and the walking time related to these activities, was compensable and

not de minimis.  Fact 98, 100.

7.     As noted above, 29 C.F.R. 785.16 provides that noncompensable breaks must be long enough to allow the employee "to use the time effectively for his own purposes." Whether there is sufficient time is fact-dependent. Opinion letters state that a second meal period is unusual and that, like break periods, for it to be compensable the employee must be able "to use the time effectively for his own purposes." The break must also be at a time of day that is suitable for a normal meal period (opinion letters dated 11/7/94, 8/30/82, 10/13/64). As noted *supra.*, these opinions do not support Tyson's view of non-compensability.

8.     Further, in *Farm Fresh Poultry*, the Eleventh Circuit ruled that a poultry processor that failed to compensate its employees for breaks of more than 30 minutes could not rely on 29 C.F.R. 785.16 to establish a good faith defense, because whether or not a break period is compensable "depends upon particular circumstances." *Farm Fresh Poultry*, 824 F.2d at 927, *quoting* 29 C.F.R. 785.14. *See Equal Employment Opportunity Comm'n v. Baltimore and Ohio R.R. Co.*, 632 F.2d 1107, 1112 (4th Cir. 1980) (interpretative bulletin does not have required specificity), *cert. denied*, 454 U.S. 825 (1981); *Pilkenton v. Appalachian Regional Hosp., Inc.*, 336 F. Supp. 334, 339-40 (W.D. Va. 1971) (same).

9.     The good faith defense requires "honesty of intention and to be without knowledge of circumstances which ought to put [an employer] upon inquiry." *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d, 1570, 1580 (11th Cir.

1985), *modified on other grounds*, 776 F.2d 265 (11th Cir. 1985); 29 C.F.R.

790.15(a).  It applies "only where an employer innocently and to his detriment,

followed the law as it was laid down to him by government agencies, without notice

that such interpretations were claimed to be erroneous or invalid." *Superior*

*Pontiac*, 765 F.2d at 1579-80, *quoting Mayhew v. Wirtz, Inc.*, 413 F.2d 658, 661 (4th

Cir. 1969);  *accord Nelson v. Alabama Institute for Deaf and Blind*, 896 F. Supp.

1108, 1113 (N.D. Ala. 1995).   The defense does not apply "where an employer had

knowledge of conflicting rules and chose to act in accordance with the one most

favorable to him." *Mayhew*, 413 F.2d at 661, *quoting* 93 Cong. Rec. 4390, *see* 29

C.F.R. 790.15(b), 790.15(d) n. 99.

     10.    Tyson representatives were told repeatedly more than two years before

the filing of this action that donning and doffing in poultry plants was compensable.

In outreach meetings attended by Tyson in January and February of 2000, DOL

representatives stated that time spent donning and doffing protective and sanitary

clothing and equipment required by the employer was compensable, and that

employees should be compensated beginning from the time they receive their

sanitary and safety equipment and begin dressing for work.  Fact 87, 88.  DOL

representatives met with a Tyson vice president and others on April 24, 2000 and

explained that "substantial changes" in Tyson's record keeping and pay practices

were needed, as "plant workers [were] required to first obtain/acquire, and then don

and doff certain necessary clothing ... without being paid." Fact 89-90. By letter of July 7, 2000, DOL reiterated that Tyson was required to pay for donning and doffing time as well as for the second break period. Fact 91. Other public statements to this effect were issued in January 2001. Facts 92-93.

11.     Tyson had far more than "knowledge of circumstances that would put it on inquiry." *Superior Pontiac*, 765 F.2d at 1580. It was provided an explanation of the Administrator's position prior to the time for which back wages are sought. It has yet to comply. *See Chavez*, slip op. at 59-63 (Tyson denied the good faith defense as it failed to change its policies when aware of the Administrator's contrary position).

12.     Tyson contends that it is entitled to the good faith defense because, in 1997, Wage and Hour investigators inspected 13 of its facilities, found compliance at all but two, and failed to bring any litigation. (Tyson's Answer to inter. 10). Tyson acknowledges that the investigators noted potential wage and hour violations involving mastercard use or clothes changes at two of its plants, but relies on the fact that DOL never pursued these violations, despite pursuing other non-related violations. *Id.*[31]

---

[31] Tyson makes a similar argument with respect to a 1987 investigation that resulted in a negotiated administrative settlement, and a 1996 investigation where no legal challenges were raised after Wage and Hour informed Tyson that time spent by employees putting on and taking off work gear is work time and should be recorded. (Tyson's interrogatory 10, Fact 96, 97, 99).

13.     Tyson has previously argued unsuccessfully that it is entitled to a good faith defense because of the Secretary's failure to bring an action. *Jordan v. IBP, Inc. and Tyson Foods, Inc.*, Case No. 3:02-1132 (M.D. TN, October 12, 2004); *see Alvarez v. IBP*, 339 F.3d at 907-08 (DOL litigation strategy is not an enforcement position). A failure to institute proceedings is not an administrative ruling. *Union Stock Yard & Transit Co. v. United States*, 308 U.S. 213, 224 (1939). Thus, an investigation that results in no enforcement is not an affirmative act. *See Dole v. Odd Fellows Home Endowment Board*, 912 F.2d 689, 695-96 (4th Cir. 1990) (employer unable to show "affirmative act of non-enforcement" when investigated for some time without resulting enforcement, though it told Wage and Hour that the Act did not apply); *Brown v. Dunbar & Sullivan Dredging Co.*, 189 F.2d 871, 876 (2nd Cir. 1951) (Non-enforcement of FLSA not sufficient for 259 defense; employer should have sought interpretative ruling as a safeguard); *Central Missouri Tel. Co. v. Conwell*, 170 F.2d 641, 648 (8th Cir. 1948) (259 defense found inapplicable where Wage and Hour had inspected employer and made no complaint about any violation); *Anderson v. Arvey Corp.*, 84 F. Supp. 55, 65 (E.D. Mi. 1949) (same).

14.     Further, the administrative practice or enforcement policy must be the Administrator's.   29 U.S.C.  259(b)(1); 29 C.F.R. 790.19(c);  29 C.F.R. 790.13(a). Statements made by other officials or employees cannot constitute interpretations,

administrative practices or enforcement policies. 29 C.F.R. 790.19(c).   In *Farm Fresh Poultry*, 824 F.2d at 930, the Eleventh Circuit rejected the good faith defense for a poultry processor who failed to compensate production employees for inactive periods of thirty minutes or more, although the employer had relied on the oral advice of a Wage and Hour compliance officer.   *See also Roy v. County of Lexington, South Carolina*, 141 F.3d 533, 543 (4th Cir. 1998) (Wage Hour District Director lacks authority to speak as the "'agency'"); *United States v. Stocks Lincoln-Mercury, Inc.*, 307 F.2d 266, 269 (10th Cir. 1962) (Regional Director lacks authority to issue rulings or interpretations); *Soler v. G & U Inc.*, 615 F. Supp. 736, 747 (S.D. N.Y. 1985) (reliance on advice from local Wage Hour office insufficient); *Pilkenton*, 336 F. Supp. at 339 (reliance on conversation with chief of local Wage Hour Office insufficient).

15.   In any event, the 1997 investigations cannot absolve Tyson of liability for violations that took place after it was informed of the Administrator's position in 2000.  The administrative practice or enforcement policy must be in effect at the time that the employer relies on it. 29 C.F.R. 790.17(h), 790.18(i).   An employer cannot rely on a rescinded practice or policy, or an invalidated interpretation.  *Id.* The reliance must be in good faith -- where the employer does not have "knowledge of circumstances which ought to put him upon inquiry" or "notice that [earlier]

interpretations were claimed to be erroneous or invalid." *Superior Pontiac*, 765

F.2d at 1579-80.

**G.    Tyson Is Not Entitled to the Good Faith Defense with Respect to the
Payment of Liquidated Damages**

1.     Pursuant to 29 U.S.C. 216(b) and (c), an employer who violates the

FLSA is liable for overtime compensation, and an equal amount as liquidated

damages, unless the employer can prove "that the act or omission giving rise to [the

legal] action was in good faith and that he had reasonable grounds for believing that

his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C.

260. [32] This standard requires that "the employer followed the law as it was laid

down to him by government agencies, without notice that such interpretations were

claimed to be erroneous or invalid." *Superior Pontiac*, 765 F.2d at 1579-80;

*accord Townley v. Floyd & Beasley Transfer Co.*, 1989 WL 205341 at \*\*2 (N.D.

Ala. 1989); *Glenn v. General Motors Corp.*, 658 F. Supp. 918, 929 (N.D. Ala. 1986)

(Eleventh Circuit has taken a "strict view" limiting application of the defense), *aff'd

in part, rev'd in part* (liquidated damages portion of decision affirmed), 841 F.2d

1567, 1573 (11th Cir. 1988), *cert. denied*, 488 U.S. 948 (1988);  *see also Dybach v.

State of Florida Department of Corrections*, 942 F.2d 1562, 1566-67 (11th Cir.

1991).  Even if an employer was subject to a policy exempting it from FLSA

---

[32] If the employer meets its burden, the Court may exercise its discretion and award no liquidated
damages, or less than the full amount. *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir.
1987).

requirements, DOL's issuance of an amended policy precludes application of the section 260 good faith defense, and liquidated damages are mandatory. *Joiner v. City of Macon*, 814 F.2d at 1539.

As discussed, *supra*, more than two years prior to the filing of this action, DOL informed Tyson representatives that time spent donning and doffing protective and sanitary clothing and equipment required by the employer is compensable, and that "second meal-period time" was compensable. Facts 87-91. Therefore, should the Secretary prevail on the merits of the case, liquidated damages must be awarded.

### Conclusion

For the forgoing reasons Plaintiff's Motion for Partial Summary Judgment should be granted.

Respectfully submitted,

ADDRESS:

Office of the Solicitor
U. S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, GA  30303

Telephone: (404) 302-5435
 (404) 302-5438 (FAX)
E-mail:
ATL.FEDCOURT@dol.gov

JONATHAN L. SNARE
Acting Solicitor of Labor

STANLEY E. KEEN
Regional Solicitor

ROBERT L. WALTER
Counsel

MICHAEL K. HAGAN
Attorney

By: /s/ John A. Black
    JOHN A. BLACK
    Attorney
Office of the Solicitor

63

U. S. Department of Labor
Attorneys for Plaintiff.

SOL Case No. 01-10415